Starbucks Corporation
Case 03-CA-285671

## Confidential Witness Affidavit

**I, <u>COLIN COCHRAN</u>, under the penalty of perjury, state as follows:**

**I have been given assurances by an agent of the National Labor Relations Board (NLRB) that this Confidential Witness Affidavit will be considered a confidential law enforcement record by the NLRB and will not be disclosed unless it becomes necessary to produce this Confidential Witness Affidavit in connection with a formal proceeding.**

I reside at ███████████████████████████

My telephone number (including area code) is (███████████

My email address is c███████████████

I am employed by Starbucks Corporation ("the Employer" or "Starbucks")

located at 1775 Walden Ave., Cheektowaga, NY 14225 ("my store" or "the Walden & Anderson store")

1) I have previously provided testimony to the NLRB in a hearing related to a petition filed by Workers United ("the Union") at my store. All information I provided in that affidavit remains true, to the best of my knowledge.

2) I am a member of the organizing committee for Starbucks Workers United. I have been a member of this committee since the first meeting the committee had on August 21. My name appears on the letter that the organizing committee sent to Starbucks CEO Kevin Johnson on August 23 announcing our organizing campaign.

3) I also have worn a union pin since the organizing drive began, I frequently speak up in employer-held meetings about the Union in support of organizing, and I have been

**Privacy Act Statement**
The NLRB is asking you for the information on this form on the authority of the National Labor Relations Act (NLRA), 29 U.S.C. § 151 et seq. The principal use of the information is to assist the NLRB in processing representation and/or unfair labor practice cases and related proceedings or litigation. The routine uses for the information are fully set forth in the Federal Register, 71 Fed. Reg. 74942-43 (Dec. 13, 2006). Additional information about these uses is available at the NLRB website, www.nlrb.gov. Providing this information to the NLRB is voluntary. However, if you do not provide the information, the NLRB may refuse to continue processing an unfair labor practice or representation case, or may issue you a subpoena and seek enforcement of the subpoena in federal court.

Initials _____

**Exhibit 3(e)**

Case 03-CA-285671

interviewed by several news publications about my support for the Union and my
activities on behalf of the organizing committee.

4) On August 25, a message was posted in our store-specific group chat for the Walden &
Anderson store. This group chat is on the GroupMe platform and everyone who works at
the Walden & Anderson store belongs to this group chat. The message that was sent was
from Jonathan Prime, who was the Store Manager at the time. He said that a special guest
was coming to our store later that week to celebrate the fall launch. The fall launch is
when Starbucks starts serving pumpkin spice lattes and other fall products.

5) On August 26, Prime sent another message to our store group chat. He said that we had
been struggling to fill our shifts. He added that we were going to reduce our hours and
call for backup because that was what was best for the partners at our store. Until this
point, the store had closed at 9:30 p.m. every night and employees would usually leave
for the night at 10:00 p.m. Prime told us that we would instead be closing at 8:00 p.m.
every night, that employees would have 45 minutes to close and would leave by 8:45
p.m. He told us that it had to do with staffing levels and making sure that we were fully
staffed. Prime also said that we would be getting a second salaried manager to support
him and to help support the store. He said it had to do with staffing levels and making
sure that we were fully staffed.

6) The Walden & Anderson store had issues with staffing since the time I started working
for Starbucks. My store had a lot of callouts, but most of these callouts were in the
morning, not the evening. As far as I am aware, no employees had complained about the
store being open too late in the evening. At that point, I was scheduled for any shifts,

Initials: _C. C._

Case 03-CA-285671

including opening shifts and closing shifts, so I was able to see firsthand the staffing
issues in the mornings.

7) On August 27, our store was visited by Allyson Peck, who is either a Regional Manager
or the Regional Vice President. I believe this was the "special guest" that Prime had
mentioned in the group chat earlier that week. I was working at my store when Peck
visited. She was accompanied by Shelby Young, who was our store's District Manager at
that time. I had only seen Young on one other occasion since I started working for
Starbucks, and that was only long enough for her to talk to my manager quickly and then
leave. On this visit, Young brought Peck around to everyone in the store and introduced
her to us one at a time. I also saw Young do a trash run and clean some dishes on this
visit.

8) Beginning on August 27, I started seeing Young in my store multiple times a week. As I
mentioned above, this was very unusual because I had only seen Young at the Walden &
Anderson store once before the union campaign started. In addition to Young, a lot of
corporate Starbucks officials started visiting our store as well. This included Deanna
Pusatier, Rossann Williams, someone named either Adam or Alec, and others. Young
also brough Mark in a for a visit; Mark replaced Young as District Manager shortly after
the union campaign was announced. Peck was another of the corporate officials who
continued to visit my store after her first visit.

9) In addition to the corporate visitors, my store was also visited by a lot of people who
were checking out our store from a facilities and operations standpoint. I do not know the
names of these people, but we would be visited almost daily by facilities workers who
would try to find the beehive that was housing the bees that were an issue at our drive

- 3 -

Initials: _C. C._

Case 03-CA-285671

thru window. These people would occasionally talk to us but more often talk to themselves about reorganizing the store or planning a remodel. Some of these visitors told us they were Regional Operations Coaches ("ROCs"). The ROCs mostly watched us work and made notes about the way things were run and how the store was operating. All of these people started coming into the store between when we went public with our organizing drive on August 23 and when the store was closed on either September 5 or 6.

10) When these visitors came to our store, they would usually, but not always, introduce themselves. Several of these officials would also ask questions about how long I had worked at Starbucks and other general questions about my time with the company. I recall that Williams asked me what my "Starbucks experience" had been like so far. I do not remember if any of the other visitors who came to my store asked me a similar question or questions. I had never been asked about my Starbucks experience before that.

11) On August 30, I received a message in the store-specific group chat that there was going to be a "partner listening session" with the Regional Director and our District Managers. There were actually two listening sessions held on September 2. Any partner in the Buffalo area who wanted to attend these sessions was invited. These sessions were both held at the Employer's store on Main Street in Williamsville ("the Main Street store"). I went to the session that started at 2:00 p.m., to the best of my recollection. The Main Street store has a conference room that the Employer used for these listening sessions.

12) For the listening session that I attended, there were about 15 baristas and shift supervisors in attendance. The meeting was held by Deanna Pusatier and Peck. I think Williams was also present for this meeting, but I cannot remember for sure. No District Managers attended this meeting. Prime, my Store Manager, did not attend either. The beginning of

Initials: _C. C._____

Case 03-CA-285671

this meeting was the corporate officials asking us questions about our "Starbucks experience" and asking how we felt about the way that our stores had been running. Several employees, including me, spoke up about why we wanted a union and why we thought unionizing was important. I talked about the staffing problems in my store that had existed since I started there. I also talked about the issues we had with bugs and bees in my store. Another issue I raised during this meeting was related to training. I said that because of the way training was done at my store, the bar was the last area on which employees were trained. Because of this, when we had a lot of baristas who were not fully trained, only a few employees at the store could be stationed on the bar. Because of this, a lot of our new hires were only trained on register and people, like me, who were fully trained were assigned to work on the bar for eight hours during a shift. I believe I was the only employee from the Walden & Anderson store at this meeting. One of the other employees who attended, Mel, used to work at my store. She said that she did not like working with Prime when she worked at our store, specifically mentioning that she did not like him disciplining people for small infractions. Other people from other stores listed concerns they had at their stores as well, but I do not specifically remember any of these complaints at this time. I do remember that in response to our complaints, Pusatier and Peck said they were horrified and told us that this was nothing like the typical Starbucks experience. I also believe they were taking notes about our complaints during this meeting. This meeting lasted about an hour and a half, to the best of my recollection.

13) I had never heard of Starbucks holding a "listening session" before the September 2 meetings were held.

Initials: _C. C._

Case 03-CA-285671

14) Before the union campaign, there was no real training given to employees at my store. There was one employee who was certified as a barista trainer but training usually consisted of putting a new employee on the floor and having them learn as they went. A lot of the newer employees were only trained on taking drive thru orders and at the warming station, the two easiest positions to learn. Because of this, people who were fully trained on bar were spending their whole shifts on bar, which is the most physically strenuous role in the store.

15) From the time I started working for the Employer, our food case had always had fruit flies in it. There were also a smaller number of fruit flies by the bar and the Frappuccino stations. There was a small issue with bees when I first started, but the number of bees got worse in the few months after I started working at the Walden & Anderson store. The bees came in through our drive thru window and landed on the nose of the various syrups that we use to flavor our drinks. I noticed that they specifically preferred the vanilla syrups. There were up to 10 bees flying around and landing on these syrups. At least five or six employees, including me, had been stung by these bees at one point or another. A customer was also stung by a bee shortly after the listening session I described above. I and other employees complained to Prime about these bees repeatedly, and I remember that a new employee went home crying on their second day of work because they suffered a bad bee sting. The only thing I remember Prime doing in response to our complaints about the bees was to tell us not to worry and that the bees were friendly.

16) The bee problems and the fruit fly issues were obvious to our customers as well. I remember specifically that an old lady had a bee buzzing around her drink and she asked

- 6 -                    Initials: _C. C._

Case 03-CA-285671

for one of our towels so that she could kill it. Customers also asked if we were planning to serve food out of the cases that were swarming with fruit flies.

17) The day after this first listening session, the Employer had an exterminator visit the Walden & Anderson store. The lobby was closed when I came in so that the exterminator could work on the bee problem. I was not present when the decision to close the lobby happened, but the lobby was closed by the time I arrived for my shift. This was the first time since I started working for Starbucks that the Employer had closed the lobby in my store. I believe that the reason the exterminator was called was because I complained about the bees and the fruit flies during the previous day's meeting.

18) On September 5, Prime sent us a message in the store-specific group chat in which he stated that my store was going to be closing. He said he would be rewriting a training schedule for the next couple weeks and that he would split it up into an AM and a PM training block. He also said that the store would be completely closed because they would be spraying the store to resolve the bee and fruit fly issues. This was the first I had heard of the Walden & Anderson store being closed down.

19) About two hours after Prime sent us the message about the store being closed, he said he would post a training schedule on the following day. Prime also said that everyone would be paid for the hours we spent in training and that if we wanted extra hours, we could sign up to clean the store.

20) The initial schedule that Prime posted on September 6 was a mess. Everyone in our store was only scheduled for 15 hours of work that week, and many people were scheduled outside of their availability. Several employees complained to Prime that they could not work just 15 hours that week and asked for cleaning shifts. I also asked for some cleaning

Initials: _____

*C. C.*

Case 03-CA-285671

shifts if they were available. Prime remade the schedule later the same day but there were still issues with employees' availability.

21) At the time Prime announced that the store was going to be closed, he did not say anything about the store being closed and turned into a training store for new hires. The only employees who were supposed to be trained at my store were our employees. It was only after we filed our petition looking to have an election at the Walden & Anderson store that it was turned into a training store.

22) During the first week that the store was closed, I came in to do the training that had been set up for us. A lot of the training was online, completing modules for different roles in the store. These modules included one for operating the register, one for making drinks, and so on. These were the same modules that employees are supposed to complete when they are first hired by Starbucks. Every employee at my store had to go through each of these modules and complete them. We were also told to complete things called "pour-over sessions," which are Starbucks modules that are supposed to spur conversation on social issues like mental health or immigration. I had never seen or heard of these pour-over sessions before this training, but we were required to watch them and then talk to each other about what we had seen. The ROCs would stop by while we were doing these modules and I would see Young come in occasionally during that time. The person running most of the training was a man named Tito, who had been introduced to us as a support manager who was going to be helping us with training and hiring at my store. I had never heard of a support manager before this happened.

23) The second week of training was a little more hands-on, where we were walked through the proper way to make a cappuccino and how to sequence drinks correctly. Most of the

- 8 -                    Initials: _C. C._

Case 03-CA-285671

training time in the second week was still spent online completing training modules. There was also a lot of down time during these training periods, which we spent either on our phones or talking with each other.

24) The cleaning shifts were hours when we deep-cleaned different parts of the store. This was either self-directed or a shift supervisor would give me an area to clean. For instance, one shift I was assigned to scrub the tables and chairs in the lobby of the store. For another shift, I moved all our refrigerators and cleaned under and behind them. We also would wrap all of the store items and equipment in plastic bags at the end of our shifts because the exterminators would come in overnight to spray the store. I estimate that they came to the store four or five times in the first few weeks the store was closed.

25) The first week that the store was closed, I was scheduled for 30 hours between the trainings and the cleaning shifts I was able to pick up. I was working about 30-40 hours per week before that, so 30 was a relatively normal number of hours for me to work. The second week the store was closed, I was only scheduled for 12 hours. These are the numbers in the Partner Hours app that I was able to pull up during this affidavit. The Partner Hours app is a Starbucks app that I can use to track my hours of work.

26) The Union filed a petition looking to have an election at the Walden & Anderson store on September 8. We ended up withdrawing the petition for strategic reasons, because we did not want our petition to slow down the petitions for the stores that had already filed for an election: on Camp Road in Hamburg ("the Camp Road store"), on Elmwood Avenue in Buffalo ("the Elmwood store") and on Genesee Road in Cheektowaga ("the Genesee store").

Initials: _____ *C. C.*

Case 03-CA-285671

27) On September 9, Prime sent a message to our group chat telling us that he had decided to step away from his position as our Store Manager at Starbucks.

28) At the end of the second week of our training, Young asked each of us what our availabilities were to work at other stores. She asked us this individually while we were all sitting together as a group. I told her that I could work at any other store. It was around the same time that I was introduced to Romalie, who was going to take over as Store Manager for some period of time after Prime left Starbucks.

29) I did not have a set schedule of where I was working for the third week of the Walden & Anderson store closure. For that week, Romalie would ask me to go to either the Camp Road store or the Genesee store on short notice. For instance, I have a message from September 23 where Romalie asked me to go to the Genesee store. I responded that I could not because she had already sent me to the Camp Road store for a 7:00 a.m. – 3:00 p.m. shift.

30) I was usually sent to the Genesee store to work during the first few weeks that I was not scheduled to work at my store. I was only sent to the Camp Road store to work on two occasions. Other people from the Walden & Anderson store were sent to these stores as well. I know that some people were sent to the Main Street store to work some shifts too. After a week of being told on a day-to-day basis where to work, there was a schedule posted for my store's employees telling us where to report. For one week, we were all scheduled to work at the Genesee store.

31) During my shifts at the Genesee store, particularly after the first few days there, I was scheduled alongside more workers than I had ever seen work at one time in a store before. During our busy shifts at my store, there were about seven or eight people

Initials: _C. C._

Case 03-CA-285671

scheduled to work. Between people from my store, employees from the Genesee store itself, and employees from the Employer's store on Niagara Falls Boulevard in Amherst ("the NFB store"), there were sometimes 15 or 16 employees on the floor during a shift. The shift supervisors, whether it was a shift supervisor from the NFB store or a Genesee store shift supervisor, had a lot of trouble finding things for all of us to do. We ended up being duplicated on different positions: two employees would be put on the hot bar, two on the cold bar, two people set up for customer service, and another employee designated just to rebrew coffee. Even with all these extra assignments, there were still too many people scheduled, so I would occasionally just be asked by a shift supervisor to do an odd job, like sweeping the lobby, instead of being assigned to an actual role in the store.

32) My understanding is that the NFB store was closed for renovations during the same time that my store was closed. We were never told by Starbucks why there were so many people scheduled to work at the Genesee store at that time. All we were told was that the Genesee store had a lot of callouts and that the extra staffing was to help with that. That did not explain why so many people were scheduled at one time. Someone made a joke in a group chat that I am part of for Starbucks employees that they would have called off too if they knew they'd have to work alongside 50 people.

33) After about three weeks of being assigned to work at other stores, I was brought back to the Walden & Anderson store to serve as a barista trainer. My understanding is that Romalie had talked to the shift supervisors at my store about which employees would make the best barista trainers. The shift supervisors, me, and another barista named Liam were all trained to be barista trainers. This involved modules on what it meant to be a trainer and then having us teach each other to steam milk while Romalie provided

Initials: _C. C._

Case 03-CA-285671

feedback. Once we were trained, we were assigned to start training new hires. I was brought back to work at my store on October 11. I believe that before we were brought back to my store to train, the support managers were responsible for training the new hires. During the time I was training employees at my store while it was closed, there were about seven baristas and shift supervisors who were training new hires, including me. These trainers were all employees from my store, except there was one trainer from the NFB store who was at our store for a short time. There were also two or three corporate officials who were also training the new hires.

34) During my training shifts at the Walden & Anderson store, I was normally scheduled for an eight-hour shift. I was assigned a training group of about three or four new hires. My job was to supervise them signing in on the store iPads and making sure they went through the training modules on the iPads. After they finished the modules, we would discuss what was in each module. After that, I would take them through a hands-on training on bar, register, and customer support. I believe that these employees were shown the same training modules that we went through when the Walden & Anderson store was first shut down. I did not usually have the same group of people for the entire week, but I would usually spend a full day training the same group of employees. The new employees were trained in mixed groups, meaning that they were not divided into groups based on the store they were going to be moved to after they were trained. These employees were pre-assigned to the store they would be sent to after their training, which I know because the store was written on the folders they were given on their first day.

35) In addition to wanting to help train new hires, I originally agreed to train the new hires at Walden & Anderson because I thought it would be a good opportunity to talk to a lot of

Initials: _C. C._

Case 03-CA-285671

new employees about the Union. I was not able to do that, though, because there were always several support managers or corporate officials in the store. They would sometimes be working on schedules, but some of them were training as well and the corporate officials would observe us training when they came into the store. There was almost no time when I was out of earshot of a manager while I was training new hires at my store.

36) I do not know if the support managers and corporate officials had meetings with the new hires to talk about the Union. I did not see any such meetings taking place when I was training at my store. I do know that the managers at the Walden & Anderson store would have the "first sip" with the new hires before we started training them. The first sip is a meeting with the manager where new hires are introduced to the store, get a rundown on Starbucks' benefits, and do a coffee tasting. I saw the support managers having these first sips with the new hires, also in pods. I sat in on a few of these first sips. I remember overhearing and seeing the managers doing the first sip really focus on the "amazing" benefits that Starbucks has. I saw one support manager giving a PowerPoint presentation about Starbucks providing free tuition through Arizona State University and talking about the health insurance benefits that the company offered.

37) We, meaning the employees who work at the Walden & Anderson store, were never told how long our store was going to be closed. Whenever someone would ask about it, we were told that the store would be closed for "two or three more weeks." Our store did not reopen to the public until November 8.

38) During the time I worked at my store as a trainer while it was closed, I lost out on the food benefit that we are supposed to receive. One of the benefits of working for

Initials: _C. C._____

Case 03-CA-285671

Starbucks is that you are supposed to receive one food meal item per shift. Because the Walden & Anderson store was closed, any food in my store was frozen and not available to eat.

39) During the time that I worked as a trainer at the Walden & Anderson store, I also lost out on tips that I would have earned if the store had been open. I also received fewer tips by being assigned to other stores while my store was closed.

40) At Starbucks, tips are calculated by taking the entire total of tips received during the week and dividing that number by the total number of hours worked by baristas and shift supervisors during that week. Store Managers are not eligible for tips. The number reached by this division is then multiplied for each partner based on the number of hours that partner worked during that week. As an example, if the total dollar figure of the tips divided by the total hours worked by partners in a week was $0.90, then someone working ten hours during that week would receive $9.00 in tips. I estimate that, before my store was closed, I would usually earn about $1 an hour in tips. However, because the Walden & Anderson store was closed to the public, I received no tips during the time I worked there when the store was closed. When I worked at the Genesee store, there were so many partners working at that store during the time I was there that the amount of the tips was diluted significantly. This is because even though there were more employees working at the Genesee store, there were not more customers than usual and the amount of equipment, like espresso makers, had not changed.

41) I do not remember how I found out that the store would be reopening, but in early November, Romalie asked me what my typical schedule was and what kind of hours I was looking to work. She had taken over as temporary store manager once we reopened.

Initials: _C. C._

Case 03-CA-285671

Romalie left the Walden & Anderson store in mid-December and returned to Seattle, where she was originally from. By the time our store reopened, we had a second support manager, a woman named Aimee from Colorado. She is currently our temporary store manager, who took over after Romalie left.

42) For the first week or two after we reopened, the store closed at 5:00 p.m. The early closing was to hold more of these training pods for new employees. After the first few weeks, the store went back to the same hours we had prior to the union campaign: open from 5:30 a.m. – 9:30 p.m. each day. This means that employees are first scheduled to work at 5:00 a.m. every day, and usually are scheduled until 10:00 p.m.

43) Right around the time the Walden & Anderson store reopened, the Union filed a petition for an election at my store. As I mentioned above, I was called as a witness by the Union in the hearing about whether we could have an election at my store.

44) Around the time that the store reopened, or maybe shortly after it reopened, I applied for an opening for a shift supervisor position at my store. I saw the opening posted on the part of the Starbucks public website that lists job openings. I applied using the Starbucks website. I was never contacted for an interview for this position and never heard back from Starbucks about the petition. I asked Tito about the application process after I submitted my application, particularly how long it takes to hear back. I told him when I had applied, and he told me that I should have heard back by that point. He said he would check into it and get back to me, but I never heard back from him about my application. There is someone else at my store who had also applied to be a shift supervisor a little earlier than that.

Initials: _C. C._

Case 03-CA-285671

45) Another employee at my store, Sydney Schreiber, applied for an open shift supervisor position a few weeks before I did. She was interviewed for this position by Mark, the District Manager. He told her that in a matter of time, she would become a shift supervisor. Sydney told me about this experience with Mark. I have seen Sydney start to have development conversations with our manager about becoming a shift supervisor. Sydney is not someone who is openly supportive of the Union; she does not wear a pin and I have not gotten the impression from talking to her that she is in favor of the Union.

46) We have one new shift supervisor in our store, whose name is Rachel. I do not remember the exact date that she started working at my store, but she transferred to my store from the store near Regal Cinemas on Transit Road ("the Transit Regal store"). She also worked as a shift supervisor in Rochester before she worked at the Transit Regal store. I was not told that Rachel was taking the shift supervisor position that I applied for and I do not know if her transfer to my store eliminated the opening that I had applied for.

47) After the store reopened, the Employer did not have mobile orders turned on for our store. I would estimate that mobile orders are about 40% of our business. As of early January 2022, the mobile orders had not been turned back on. I believe this has led to about a 30% cut in business during the time that the mobile orders were shut off. About a week or two after the store reopened, I asked Romalie why the mobile orders had been turned off. She said that we were not going to turn the mobile ordering back on until our drive thru times improved. Not having to deal with mobile orders makes our lives as employees much easier because it means we are not as rushed as we used to be when the mobile orders were turned on.

- 16 -

Initials: _C. C._____

Case 03-CA-285671

48) During the time that the Walden & Anderson store was closed, about six or seven employees left my store. Some of these employees transferred to another store and a few of them quit Starbucks altogether. I think that the Employer also hired about 15 new employees for my store while it was closed. The Walden & Anderson store had about 24 or 25 employees at the time I was hired, and probably still had about 21 or 22 when the store was closed. Between the new hires and the people leaving the store, we now have about 34 employees. The staffing levels in the store after we reopened have definitely been higher than they were before we were closed.

49) Since reopening, the Walden & Anderson store is still being used as a training center for other stores. I believe that the Employer has set up three stores as training sites: my store, the NFB store, and a store on East Robinson Road ("the East Robinson store"). At my store, new employees are still trained in pods of three or four people, similar to what we were doing when the store was closed. New hires are also having their first sips at stores other than the one they will eventually work at. This is different to how I was hired and trained: I was hired by Prime for my store and I had my first sip with him at the Walden & Anderson store. I was also trained, to the extent I received any training, at my store.

50) While the store was closed, I believe I received a bonus for training new employees. I do not recall the amount of that bonus. I have not been assigned to train a single employee since our store reopened, despite our store continuing to train new employees for other stores. Several weeks after we first reopened, after I noticed that I wasn't being assigned to train any new employees, I asked Aimee and MK, a new District Manager, why I was not being assigned to train new employees. I said that I really enjoyed training and that I would like to be scheduled for training shifts. Aimee said that there was an issue with the

Initials: _C. C._

Case 03-CA-285671

system where only Liam was scheduled for training shifts. She said that she expected it to be corrected and that while I wouldn't be scheduled to train anyone the week of our conversation, I should be scheduled to train people the week after that. This did not make sense to me because Liam was not the only barista being assigned training shifts at the time I talked to Aimee and MK. The people at my store who have been training employees since the store reopened includes Liam, Hannah, Alec, Michael, Taylor, and Francis. Of those employees, only Hannah is on the union organizing committee. Even though Hannah signed on to the letter to Kevin Johnson, she does not regularly bring up the union or wear a union pin. I wear a union pin every day and I regularly bring up or mention the Union while at work and elsewhere. I believe that I am not being given any opportunities to train employees because I am so outspoken about the Union.

51) Liam recently left the Walden & Anderson store. As I understand it, he was trying to transfer to another Starbucks location after his school semester ended. Before Liam left, he had started wearing a union pin at work. He was told by the support managers that he was not allowed to wear the hat he had always worn, which has an adidas logo on it. Instead of not wearing the hat, Liam put a union pin on his hat to cover the logo.

52) Right around the time that our store reopened, the support managers in our store began focusing on dress code a lot more strictly. From talking to employees at other stores in the Buffalo area, it seems like something that all stores were focusing on at the same time. During the first week that the store reopened, Romalie told me that the shoes I was wearing were not appropriate for work because they had a canvas toe instead of a solid toe. She said that hot water could get through the shoe if it was spilled on the toe. I had to buy a new pair of work shoes because of this conversation. I had worn these shoes to

Initials: _C. C._

Case 03-CA-285671

work every day since I had been hired with no issue. Romalie also told me that a sweater I was wearing was not the right color and that it was not in dress code. I do not remember how frequently I had worn that sweater to work, but in general, I had never been talked to about not being in dress code before our store reopened.

53) I have described above that Liam was told that he could not wear his adidas hat because of the logo on it. He also had worn that hat every day that I had worked with him up to that point without any issue.

54) A newer employee named Michael was told by Romalie that the jacket he was wearing, which had wording on the back, was not permitted because the words were too big. Another new employee, Callie, was told that her shoes were too white and that they weren't in dress code. Michael and Callie are both new employees so I am not sure for how long they had worn these items of clothing before being told that they were not permitted.

55) On September 28, while my store was closed, I attended a meeting held by the Employer. This meeting was led by Kate, who told us she was from Starbucks Partner Resources. I do not know Kate's last name or her title. Also attending this meeting was Mark, who was the District Manager for our district who took over after Young left in September. This meeting was held in the lobby of the building of my store. There were about five employees who attended this meeting, including me. We were sitting in a circle of chairs during this meeting. I used my cell phone to record this meeting. The phone was either in my pocket or on my lap while I was recording. My understanding is that the Board agent has been provided with a copy of this recording. I do not believe that there is anything

Initials: _C. C._

Case 03-CA-285671

that occurred during this meeting that is not capture on the recording. Based on how few

people were in attendance at this meeting, I do not believe it was mandatory.

56) Employees at my store were also told to attend meetings at the Hampton Inn in

downtown Buffalo on October 19. There were several meetings held for employees at my

store, and we were each assigned for a specific time. I received a letter from the

Employer telling me what time my meeting was supposed to be, but I do not recall what

time that was. The only employees who were scheduled for the same meeting as I were

Hannah and Katie. They were the only two employees at my store, besides me, There was

a meeting at the Hampton Inn downtown. The only people scheduled for it were me,

Hannah, and Katie. The three of us were the only remaining employees at the Walden &

Anderson store who had signed on to the letter to Johnson announcing our union drive.

Teagan, another employee from my store, ended up attending our meeting as well even

though she was not scheduled for that meeting. As far as I am aware, the Employer had

no issue with Teagan attending this meeting even though it was not her assigned time.

The meeting was held by Kate and Mark, as well as a third corporate official whose name

and title I do not recall. I recorded this meeting on my cell phone, which was again either

on my lap or in my pocket during the meeting. Kate was presenting a PowerPoint about

the Union's constitution during this meeting. Other than the slides of the PowerPoint,

nothing that occurred during this meeting was not captured on the recording that I made.

The only exception is that I remember that the Employer served peach tranquility tea

during the meeting, which is a personal favorite of mine. My understanding is that the

Board agent has been provided with a copy of the recording that I made of this meeting.

Unlike the September 28 meeting, I believe that this meeting was mandatory, because

Initials: _C. C._____

Case 03-CA-285671

employees were supposed to go to a makeup meeting if they could not attend the meeting they were assigned to go to.

57) Although not a store-specific meeting, I attended the Howard Schultz event that was held in downtown Buffalo. The only unusual thing that happened to me personally during this event was that the Chief Operating Officer, John Culver sat directly next to me at this event. I was wearing a union t-shirt at that time. There was a paper saying "reserved" on the seat he sat on and the seat I sat on, but the seats with "reserved" on them were the only ones not taken when I sat down. These papers did not say for whom the seats were reserved. There were also other seats that were not taken that he could have sat on instead of sitting directly next to me.

58) Since the Walden & Anderson store reopened in November, there is almost always a support manager at our store. The only real exceptions are the first two hours or so of the morning shift, until about 7:00 a.m. or so. Because I do not work many closing shifts, I do not know if the same thing happens at the end of the workday as well. Other than these few hours, one of the support managers is present in the store. In addition to Aimee and Romalie, we have had support managers named Fred and Katie who have worked regularly at our store beginning in December. In addition to these support managers, corporate officials continue to visit our store on a regular basis. This is a major change from how the store was staffed before the union campaign. When Prime was the Store Manager, he worked about 40 hours a week and about five days a week. Other than those 40 hours per week, the store did not have a manager in the store.

59) During the first few weeks after the organizing drive went public, I had multiple conversations with my coworkers about the Union and collected multiple signed union

Initials: _C.C._____

Case 03-CA-285671

cards on the floor. We did this during quick breaks between making drinks and working on the register. After the store was closed, there was no opportunity to have those conversations because the people still in the store were being overseen by multiple managers and the rest of the partners were assigned to other stores. Once we reopened, at least one and usually multiple support managers are on the floor at any given time and it is almost impossible to have a conversation with another partner about the Union during work. Especially when the lobby of the store is closed, it is very easy to overhear a conversation on the floor from anywhere in the store. Even when the lobby is busy, the store is small enough that it is easy to overhear other peoples' conversations. There are sometimes a few minutes passing someone in the back room where I can have a private conversation with a coworker, but that is very rare.

60) The Employer has been closing the lobby, meaning not allowing customers to sit and stay in our store, more regularly since the union campaign started. The store has had a lot of COVID issues in recent weeks and months, so that may have been part of the reason that the lobby has been closed to customers.

61) In addition to being stricter about the dress code, the Employer has made other changes in how the store is run. Before the union campaign, we never used operations cards, which contain tasks that are supposed to be performed during the day each day. We have also been stopped from having someone handling the drive thru orders also running food from the ovens. This was a regular practice before the union campaign started, but Romalie told us that it was not up to standard, meaning Starbucks' standard on how things should be run. Romalie also told us that when we made a drink with whipped cream, we should

Initials: _C. C._____

Case 03-CA-285671

pour the milk using a spoon to avoid issues with the whipped cream. Although this type of micromanaging has lessened since Romalie left my store in mid-December.

62) The next meeting I attended that was held by Starbucks was held on December 14. I was scheduled to attend this meeting, but I do not remember how far in advance I found out about this meeting. The meeting was held in the evening and the store was closed early for this meeting. There were about five employees attending this meeting. Holding the meeting were MK, Mark, and a woman named Kathleen. I do not know Kathleen's last name or her full title, but I believe she works for Partner Resources. I recorded this meeting on my cell phone. I do not believe there is anything that occurred during this meeting that would not be contained on the recording. I will provide a copy of this recording to the Board agent.

63) I attended a meeting that was held at my store on January 4, 2022. This meeting was held in the lobby of my store. There were about five employees who attended this meeting. The meeting was led by MK and Kathleen. I recorded this meeting using my cell phone. I do not believe that there was anything that occurred at this meeting that was not captured by my recording. I will provide a copy of this recording to the Board agent.

64) My girlfriend, Kat Baganski, was recently hired by Starbucks. Because we, meaning the employees at my store, talk to each other about our personal lives, I have talked about Kat to my coworkers on multiple occasions. Additionally, Kat came to a soft reopening that we had for friends and family at the Walden & Anderson store just before it reopened to the public in early November. During that soft opening, I introduced her to Romalie and to Mark, the District Manager, as my girlfriend.

Initials: _C. C._

Case 03-CA-285671

65) In mid-December, just before Christmas, MK came to our store and met with each of us one-on-one. During my conversation with her, MK told me about herself and asked me questions about my personal life. I had told her that Kat normally did archaeological work and that involved digging. I told MK that because it was getting cold, Kat was looking for something to do during the winter and was looking to apply to work at Starbucks. MK said she thought she thought that was cool.

66) A few weeks later my first conversation with MK about Kat, in early January, MK asked if there were any updates on Kat's hiring process. It was actually the day that Kat was having her first sip, and I told MK that. MK asked where Kat was having her first sip, and I said it was either at the East Robinson store or at the Starbucks in Orchard Park. Aimee, who was also present when we were talking, looked up Kat in Starbucks' system and said that Kat was having her first sip at the East Robinson store. Aimee also told me and MK that Kat's permanent store was going to be at the store located at the corner of Sheridan Drive and Bailey Avenue in Amherst ("the Sheridan & Bailey store").

67) To my knowledge, Kat has not been moved to the Sheridan and Bailey store. That store, like my store, is currently in the middle of a union election. I believe that the Employer is keeping Kat from moving to the Sheridan & Bailey store because they believe she is a union supporter and because she is the girlfriend of a strong union supporter.

68) I have nothing further to add at this time.

Initials: _C.C._____

Case 03-CA-285671

**I understand that this affidavit is a confidential law enforcement record and should not be shown to any person other than my attorney or other person representing me in this proceeding.**

**I have read this Confidential Witness Affidavit consisting of 25 pages, including this page. I fully understand the Affidavit and I state under penalty of perjury that it is true and correct.**

**Date:** _____03/27/2022_____       **Signature:** _Colin Cochran_____

                                              **COLIN COCHRAN**

**This affidavit was taken by:**

**THOMAS
MILLER**

Digitally signed by
THOMAS MILLER
Date: 2022.03.28 08:58:29
-04'00'

**THOMAS A. MILLER**
**Board Agent**
**National Labor Relations Board**

Initials: _____

Starbucks Corporation
Case 03-CA-285671

## Confidential Witness Affidavit

**I, <u>RACHEL COHEN</u>, under the penalty of perjury, state as follows:**

**I have been given assurances by an agent of the National Labor Relations Board (NLRB) that this Confidential Witness Affidavit will be considered a confidential law enforcement record by the NLRB and will not be disclosed unless it becomes necessary to produce this Confidential Witness Affidavit in connection with a formal proceeding.**

I reside at █████████████████████

My telephone number (including area code) is (████████████

My email address is ████████████████

I am employed by Starbucks Corporation ("the Employer") or ("Starbucks")

located at 3186 Sheridan Ave., Amherst, NY 14226 ("the Sheridan & Bailey store" or "my store")

1) I have previously testified before the NLRB at a hearing involving whether an election could be held at my store. All the testimony I provided in that hearing remains true, to the best of my knowledge.

2) I am currently a shift supervisor for the Employer. I have been employed by the Employer for 10 years. I have been a shift supervisor for about seven years. I have worked at the Sheridan & Bailey store four about four years. My current availability is that I can work any day of the week except Tuesday and Thursday. I am available to work midshifts, meaning between 7:00 a.m. and 5:00 p.m. I usually work about 29 hours a week.

3) All dates in this affidavit are in 2021 unless otherwise stated.

**Privacy Act Statement**
The NLRB is asking you for the information on this form on the authority of the National Labor Relations Act (NLRA), 29 U.S.C. § 151 et seq. The principal use of the information is to assist the NLRB in processing representation and/or unfair labor practice cases and related proceedings or litigation. The routine uses for the information are fully set forth in the Federal Register, 71 Fed. Reg. 74942-43 (Dec. 13, 2006). Additional information about these uses is available at the NLRB website, www.nlrb.gov. Providing this information to the NLRB is voluntary. However, if you do not provide the information, the NLRB may refuse to continue processing an unfair labor practice or representation case, or may issue you a subpoena and seek enforcement of the subpoena in federal court.

**Exhibit 3(f)**

Initials _____R.C._____

4) I am a member of the organizing committee for Starbucks Workers United ("the Union"). I have been a member of this committee since shortly after the committee sent a letter to Starbucks CEO Kevin Johnson announcing the organizing drive. My name is not on that letter because I joined the committee after that letter had been sent. I wear a union pin at work for all of my scheduled shifts and I have been outspoken about my support for the Union in news interviews and elsewhere.

5) The Store Manager for the Sheridan & Bailey store at the time I started working at this store was Matthew Morreale. Morreale left the Employer in either August or September, after the union campaign started. I do not remember the exact date that Morreale left Starbucks.

6) Very quickly after the union campaign was announced, I started seeing corporate officials from Starbucks visiting my store. These corporate officials have continued to visit even as of the date I am giving this affidavit. For the first few days, these visits were made by the two District Managers in our area. At that time, Shelby Young was the District Manager for my store's district. The other District Manager in Buffalo at that time was David Lafrois.

7) Before the union campaign started, I had seen Young visit my store very infrequently, about three times a year. After the union campaign started, Young started visiting the Sheridan & Bailey store once or twice a week. Beyond ordering a drink, Young did not interact much with the baristas and shift supervisors on these visits, as far as I could tell. She usually sat down with Morreale for long periods of time, but I do not know and could not hear what they were talking about. These sit-downs usually happened at the biggest table in the middle of the lobby of my store.

Case 03-CA-285671

8) After about two weeks of Young and Lafrois coming into our store more frequently, I started to see other Starbucks officials visit my store that I had never seen before. I do not know the names of everyone who came into the store during that time, but I remember seeing Deanna, the Regional Director, and Melanie Joy, a District Manager for Starbucks licensed stores in Florida. Other people that I can recall are Louis, a District Manager from Chicago, Rossann Williams, the President of Starbucks North America, and a man named Adam. I do not know Louis' last name. I do not know Adam's last name or his formal title with Starbucks, but he is involved in community engagement. During their first few visits to my store, I saw them walking around the store a lot and making calls to people in Starbucks' facilities department about things that needed to be fixed in the Sheridan & Bailey store. They also would occasionally clean parts of the store, but I do not recall seeing any of them serve customers during their visits to the store. Once these visits started, I saw at least one of these corporate officials in my store almost every day.

9) I did not have any real conversations with any of these corporate officials. A barista at my store was pulled off the floor by Adam because the barista had mentioned wanting to get more involved in community events in Buffalo. Another shift supervisor, Sam Amato, told me that Adam came into the store during one of Amato's closing shifts and pulled Amato off the floor to have a conversation with him. Amato said that Adam asked him about his experience at Starbucks. Amato also told me that while this conversation was nice, it delayed the closing of the store that night.

10) Before the union campaign started, the highest-ranking Starbucks official that I had ever seen was a regional manager who had come to the Sheridan & Bailey store about three years ago. That was the only time I had ever seen a regional manager in my store. That visit from the regional manager was because employees at the store had filed a complaint.

- 3 -                Initials:   **R.C.**

Case 03-CA-285671

11) On September 2, the Employer held "listening sessions" for Starbucks employees in the Buffalo area. I heard about these listening sessions by word of mouth at my store. I went to a listening session that was held at about 4:00 p.m. on September 2. These listening sessions were optional, as far as I am aware. Amato went to the same listening session that I did. This listening session was held at the Employer's store located on Main Street in Williamsville ("the Main Street store"). The Main Street store has its own meeting room inside the building. During the meeting I attended, there were six or seven tables set up and chairs around each table. There were about 15 baristas and shift supervisors who came to this meeting. The meeting was held by four corporate Starbucks officials. Williams, Deanna, and two other people whose names I do not know. The other two officials' titles were partner operations manager and store operations manager, and they only spoke up if someone had questions about store operations matter or store managers. The meeting started with the four corporate officials introducing themselves. One of the employees who attended this meeting was on the organizing committee. I do not remember who this person was, but I know that they asked Williams and Deanna to sign fair election principles. Either Williams or Deanna said that they would not and could not talk about the Union at this meeting. They said this meeting was to talk about our concerns and how things were going at our stores. One of the employees asked her about the amount of labor for our stores. Williams said there was an entire app that people could use to see the labor for each store. Williams also said that they were going to be more lenient on labor and allow our managers to add more labor. I asked about

decorations in our stores because we had previously been told that we were not allowed to decorate our stores at all. They said that they would look into that and get back to us. I also asked about the training that new hires receive. I said that in my ten years with

Case 03-CA-285671

Starbucks, the training had changed. When I was first hired, training lasted about six weeks and there were only two channels of ordering. Now, we have more channels of ordering but the training time had been cut in half from when I first started. I asked if there was a plan to revamp the training. They told me that they were working on training and would get back to me. Other people complained about the dress code being inconsistent and their issues with that. The meeting lasted about an hour, to the best of my recollection.

12) Between September 2 and 22, both Young and Lafrois, the District Managers who were in charge of Buffalo, left Starbucks. The new District Manager assigned to my store after Young left was Mark Szto.

13) I was never pulled aside for a one-on-one conversation with any of the visitors who came to our store. I do not know if this is by design or not. Amato told me that after the September 2 meeting, he had a conversation with Williams and Adam where they asked to talk to me. Amato said that they told him that they were proud of our courage for speaking up and introducing ourselves before the September 2 meeting. I was not working during this conversation, but Amato told me about it.

14) For about a month-long period, Williams and Adam came in every Friday and talked to at least one or two of the partners who were working on the floor that day. Williams usually did most of the talking, but Adam was present as well. I was running the shift when they came in for each of these visits. I was not pulled off the floor by Williams or by Adam, but I would need to reconfigure the shift every time they pulled someone aside to have a conversation. These conversations lasted anywhere from 20 minutes to over an hour. Several of the baristas told me about their conversations with Williams. One mentioned

- 5 -                    Initials:    **R.C.**

Case 03-CA-285671

that Williams talked to them about moving up in the company, and the other one said that

Williams had talked to them about some of the concerns they had inside the store.

15) At the time the union campaign went public, the Sheridan & Bailey store was one of the

only stores in the area that had older-model espresso machines. Employees at my store,

including me, had been asking Morreale for about two years to have these machines

upgraded, but they never were. Within two weeks of the union campaign starting,

Starbucks replaced our espresso machines with new models. Also in the first few weeks

of the union campaign, the Employer installed new bars, replaced the store's alarm

system, and deep cleaned the store.

16) Although I do not remember the exact date this occurred, I remember Starbucks

announcing seniority pay within a few weeks of the union campaign going public. I recall

that this announcement was that we would receive either a 5% or 10% raise based on the

amount of time we had been with the company. The impression I had was that this was a

one-time raise, which is different from the yearly raise we receive. As of the date I am

giving this affidavit, I have not received this raise. Starbucks typically gives out an annual

pay increase. We had already received our pay increase for the year before the Employer

announced this seniority raise. The seniority pay announcement was made on the Partner

Hub, an internal app where Starbucks shares information with employees. It was also

printed out by a shift supervisor and put on the clipboard we use for these things. The

clipboard also has a copy of the schedule on it. I believe I first saw the announcement for

the seniority raise on the clipboard and then later saw it on the Partner Hub, but I am not

sure about that.

17) The first time I saw a "support manager" at my store was actually on my day off. I came

into the store on my day off and saw someone I did not recognize working on the bar. I

Initials:    **R.C.**

Case 03-CA-285671

asked a coworker who that was, and they said that this was our new support manager, Derek. Derek is a Store manager from Minnesota. There were two other support managers who were in my store that day. While I was there, I saw them cleaning and looking for facilities issues that could be fixed quickly. I do not remember the exact date this occurred.

18) At around the same time that Derek first showed up at my store, we received another support manager named Sara. Sara is a Store Manager from Chicago. About a week later, we received another support manager named Jared. I do not know where Jared was from; he was only stationed at the Sheridan & Bailey store for about two weeks. About three weeks after Sara and Derek first showed up at my store, another support manager named Amber came to our store. Amber is from West Virginia. I do not recall the last names of these support managers at this time. Amber left the Sheridan & Bailey store on December 17. Derek left on December 20, and Sara left on December 22.

19) Between the time that the support managers first arrived at the store and when they left, I cannot remember a single shift that I worked where at least one of them was not present.

20) I attended a meeting held for employees at the Sheridan & Bailey store on September 22. This was the first meeting that I attended that was specific to my store. I do not recall exactly how far in advance of the meeting I was informed that it was going to be held, but I do remember that it was on very short notice. We, meaning the employees at my store, were under the impression that this meeting was mandatory. We believed this because the meeting was added to our schedules that had already been posted. Much more recently, in early January 2022, I learned that these meetings were not mandatory. The meeting was held at 3:00 p.m., and the Sheridan & Bailey store was closed at 2:00 p.m. for this meeting. Approximately 20 employees attended this meeting, out of about 28 total

Case 03-CA-285671

employees at my store at that time. I was working that day, and the meeting was held at the end of my scheduled shift. Many other employees had to come in on their days off or come back to the store after the end of their shifts for this meeting. The meeting was held in the lobby of the store. The chairs were set up in a circle and we, meaning the employees at the meeting, tried to set them up so that we were as distanced from each other as possible. Deanna was in charge of the meeting, but Szto was there too, as well as a third person. The third person was a man, but I do not remember his name or title at this time. I know his role was to answer questions about unions. The first 30 minutes or so of the meeting was this man giving us an introduction on himself and giving us more details about his background. Although he said he was there to answer questions about the Union, he took such a long time introducing himself that he only allowed us a few minutes for questions after that. Even though he had told us that he was there to give us information about unions, he said he was not an expert on unions. Among the questions that he was asked were questions about training and health insurance. I remember that Amato brought up a health insurance issue that he had about a tumor that he could not afford to have removed, but the man was very curt and cold in responding to Amato's concern. I asked the corporate officials to tell us what they were doing to fix the issues we were raising and what was going on behind the scenes. The man whose name I do not remember just said that they were there to help and wanted to look at some of the programs and training that people had concerns about. Training became a topic during this meeting because one of the other employees, a barista trainer, said that they had felt underutilized and had not been given the proper tools to train new employees. The response from the corporate officials was that all training was going to be done at the store located at Walden Avenue and Anderson Road in Cheektowaga ("the Walden &

- 8 -        Initials: ___**R.C.**___

Case 03-CA-285671

Anderson store") and that it was going to be great. I do not remember anything else from this meeting at this time. This meeting lasted about two hours, to the best of my recollection.

21) Before the September 22 meeting, I can only remember one other time when the Employer closed the store for a meeting. This was several years ago, in the summer of 2018, and we were trained about racial bias during that closure. I believe this was something Starbucks did nationwide at that time.

22) I do not remember exactly when the Walden & Anderson store was closed and turned into a training store. It may have been in the process of closing when we had our meeting on September 22. As I understand it, the Employer turned the Walden & Anderson store into a training store for new hires. It was not used to retrain existing employees, to my knowledge. New partners are trained in the store that they are hired to work in or another active store, depending on where a barista trainer is available to train them. Before the Employer closed the Walden & Anderson store, I had never heard of new employees being trained at a closed site.

23) Since the Walden & Anderson store was turned into a training store, we have not trained any new employees at my store. My store has three barista trainers, who have not been able to train any new employees since the Walden & Anderson store closed. Barista trainers receive a $75 bonus if the person they train stays with Starbucks for at least 90 days. Barista trainers are given dedicated time with new hires to train them and to have the new employee shadow the trainer.

24) As of the time I am giving this affidavit, there have been about eight new employees at our store who were trained at the Walden & Anderson store. I believe that at a minimum, four of these new hires would have been trained at our store under normal circumstances.

Case 03-CA-285671

25) The employees that we received from the Walden & Anderson store were not ready to
serve live customers when they first arrived at our store. From what I observed of these
new partners, they were given minimal training before they were assigned to work at our
store. I noticed in particular that none of them seemed to have much experience on the
register or in sequencing beverages properly. They also were unprepared to go from a
closed store to a very busy store, which our location is. Employees working alongside
these new hires had to basically re-train them all whether or not we were actually barista
trainers. Unlike a normal training experience, we had to train these new employees while
trying to do our own jobs in full. Shift supervisors, including me, brought up the issues
with the new hires not being trained several times during shift meetings with store
management. I remember at least two occasions where we raised this issue: once in
September with Morreale and again in November with Derek. Both times we were told
that there was nothing they could do because those employees had technically already
been trained.

26) Morreale left Starbucks sometime in Septembe, although I do not remember the exact
date that he left. I learned that he was leaving because Szto called me to tell me that
Morreale was leaving. I believe Szto called most of the employees at my store around the
same time. Morreale told me that the reason he was being let go by Starbucks was
because he failed to use the COVID coach and did not properly do COVID check-ins for
employees. He said he was told that it was directly putting partners in danger and that this
was why he was being let go. At the time Morreale was let go, we had not had any
COVID outbreaks in our store recently. There were two COVID outbreaks sometime in
2020 but none in 2021, to my knowledge. I do not believe my store had filed for an
election at that time but I think the Employer was trying to get rid of as many Store

Initials:   **R.C.**

Case 03-CA-285671

Managers in Buffalo as they could, based on how many tenured managers were let go after the organizing drive started.

27) After Morreale was let go by Starbucks, Derek took over running the store in terms of writing schedules and dealing with complaints or problems from the hourly partners. Sara did not seem to have any role in running the store, as far as I could tell, beyond being an extra body on the floor of the store. I did see her have coaching conversations with several employees, but that was the extent of her management responsibilities, to my knowledge. Amber was almost a mix of manager and extra helper on the floor. Amber was much stricter about making sure we were following some of the company's policies, like dress code and time & attendance. Amber also told us that we needed to use the Playbuilder tool when we were running a shift. We had never been told that it was a requirement before Amber said this to us.

28) The Employer closed the Sheridan & Bailey store on October 13 for a reset. The night before the store was closed for the reset, the Employer had the store deep cleaned by a contracted company. On the day of the reset, employees, including me, were scheduled to come in and help with the reset. This involved moving shelving, products, and other items in the store around be more convenient to us. Workers also came in from outside the store and reset the internet connection and computer systems in the store on October 13. Morreale and Joy were both at the store overseeing the reset. In my time with Starbucks, I had never experienced a "reset" like the one that took place on October 13. In the past, if there were smaller changes that needed to be made, the Store Manager would discuss it with the shift supervisors at a shift meeting and it would be carried out while the store was still open. The store had never been closed for a one-day reset like this one in my time with the Employer.

Case 03-CA-285671

29) The Employer's assignment of support managers has cut down substantially the ability of employees at the Sheridan & Bailey store to talk about things among ourselves. Although our store is larger than many other stores in the area, the actual working area, behind the counter, is small enough that it is hard to have private conversations. Before the support managers started working at our store, this was not an issue because there were plenty of occasions where Morreale was either not at work or out of earshot of employees. Since the support managers have arrived at the store, they have been present almost every hour that the store is open. This cut down on all the sidebar conversations that we, meaning the employees at the store, usually had with each other. It is also obvious to us that the reason these managers are here are not to support us but instead to intimidate us into not supporting the Union.

30) When Morreale was our manager, he was not very strict about making sure employees followed Starbucks' dress code to the letter. Morreale did not allow us to wear neon colors and he also was strict about dress code issues that involved food safety, like long hair and nail polish, but he otherwise was relaxed about making sure everyone was following the dress code strictly in every respect. In fact, Derek had us, meaning employees at the Sheridan & Bailey store, sign a confirmation of the dress code policy sometime in November, although I do not remember the exact date that this occurred. We were required to sign this policy confirmation and a policy confirmation regarding time and attendance at the same time.

31) The support managers, in particular Amber, have been much stricter about the dress code since they started working at our store. I recall Amber telling an employee who was wearing brown boots that the boots had too much red in them and were not allowed, even though Jared had previously said that the boots were "borderline" but fine. Another shift

Case 03-CA-285671

supervisor at my store, Danny, was told by Amber that their shorts were too short. Danny measured their shorts and the shorts were exactly the right length, so he was allowed to continue wearing them. I also remember that Amber caused a lot of confusion by telling us that we could not wear t-shirts to work but then showed us examples of acceptable clothing that included t-shirts. Although I was not involved in this conversation, I heard that an employee at my store had a conversation with Amber after Amber told the employee they were meeting the Employer's dress code. The employee told Amber that it might take time to change their wardrobe because of the financial cost of doing so. Amber responded that the employee knew the dress code when they signed up to work at Starbucks. I was not present for this conversation.

32) In November, the Employer also started cracking down on employees for time and attendance issues. The biggest area in which I have noticed the Employer being stricter is for callouts. A lot of the employees that the Employer recently hired are students and have a lot of scheduling conflicts with their school schedules, so they tend to call out more often than the non-students. I believe this is part of the reason that we were required to sign the time and attendance policy.

33) I attended a shift meeting on November 17 with the other shift supervisors and with Derek. All of the store's shift supervisors, except one, were present for this meeting. Although Derek called this meeting, we, meaning the shift supervisors, used it to discuss some of our concerns in the store. Specifically, we told him that we were having trouble connecting with the new partners in the store. We told him that we needed to spend more time training the new employees and helping them have better customer connections. We offered to give up some of our time as shift supervisors to shadow the new workers and suggested to Derek that we have the barista trainers into our next meeting to get a plan

together. Derek did not address our concerns other than saying that there was nothing that could be done. He also told us in this meeting that we needed to use the Playbuilder tool and do a better job documenting things in the store. This meeting started at about 6:00 p.m. and ended at around 7:00 p.m.

34) The Employer held a store meeting on November 18. The meeting was held at the store to have us meet the new support managers that had recently been stationed at our store. I did not attend this meeting. I heard from other employees who did attend the meeting that the purpose was to meet the store managers.

35) On November 20, Derek held another meeting for shift supervisors. I did not attend this meeting. Two of the other shift supervisors who attended this meeting told me that Derek used this meeting to talk about things that could be improved from the store reset that was recently completed.

36) In November, I attended a meeting held at a hotel for employees at the Sheridan & Bailey store. There were several meetings held for employees at my store on the same day. I do not remember the exact date of this meeting. The meetings for my store on this date were held at a hotel near the Buffalo airport, although I do not remember which of the hotels this meeting was held at. The meeting I was scheduled to attend began at 9:00 p.m. There were five of us who attended this meeting, all shift supervisors. The meeting was held by Szto, Joy, and a woman named Denise. I do not know Denise's last name or her title, but she is a corporate Starbucks official. During this meeting, we were shown a PowerPoint presentation about the Union. I recorded this meeting on my cell phone and I will provide a copy of this recording to the Board agent. I recall that us, meaning the employees attending the meeting, interrupted their presentation with a lot of questions about why they thought we could lose benefits, and asked them who would take away our benefits.

Case 03-CA-285671

They largely did not answer these questions from us. We asked about union dues and why they were trying to use union dues as a weapon when they knew how little we make. This meeting lasted about an hour. Denise did most of the talking for the employer and Joy controlled the PowerPoint presentation. Szto did not speak very often during this meeting, to the best of my recollection. I recorded this meeting using my cell phone and will provide a copy of the recording I made to the Board agent.

37) I also attended a meeting held on December 16. This meeting was held at the Sheridan & Bailey store. There were two meetings held that day. One was held from 5:00 p.m. – 6:00 p.m., and that was the meeting that I attended. The second meeting was held from 7:00 p.m. – 8:00 p.m. The store was closed early to hold this meeting. The people holding this meeting were Case, Deanna, and a third Starbucks official who I had never seen before. I do not recall this woman's name. There were about 15 employees from my store attending this meeting, including me. There were also two other people who did not introduce themselves who came to our store during this meeting. They did not attend the meeting. Instead, they stood outside the store and handed out recovery cards to customers who were expecting us to be open. Recovery cards are one-time use gift cards that we usually give out to customers if they complain that we made a mistake with their order. I recorded this meeting as well on my phone and will provide a copy of this recording to the Board agent. I recall that during this meeting, the corporate officials tried to tell us that we should be worried about being unionized. They told us that if Starbucks wanted to give a raise or some other benefit to every employee, they wouldn't be allowed to because of the Union. I asked them if they would host a Q&A with union members to give the union perspective on some of the things the Employer was telling us, but they said no. They also told us that we should do our own research about the Union but also tried to tell us that the information on

Case 03-CA-285671

the Union's website was not something we should rely on as factual. The meeting lasted for
about an hour.

38) The Sheridan & Bailey store does not have a lot of open wall space. The only real place
to post any kind of notices or literature is on the refrigerators in the back of the store.
That is where our schedules are normally posted and where we post our product ordering
schedules, but other, non-Starbucks information is also allowed to be posted there.
Employees have put their birthdays and anniversaries on the refrigerators in the past as
well as putting up cards we've received at the store. Amato and I are very active in the
organizing campaign, and we receive a lot of the pro-union pamphlets and flyers that are
made for the campaign. He and I have put these flyers and pamphlets on the refrigerators
regularly through the campaign. Each time we put them up, someone takes them down,
sometimes by the next day after we put them up. We have tried writing "don't rip down"
on the flyers, but they still have been taken down. I have never seen anyone physically
remove the union flyers and pamphlets. The only flyer that remained up for longer than a
day or two was one that looked highly legal.

39) In early December, I came in to work and saw that the only thing that was posted on the
refrigerators was our current employee schedule. This was on a weekend, I believe, but I
do not remember the exact date. I asked Derek what had happened. He said that facilities
workers had come in and cleaned everything in the store. Derek also told me that we were
no longer allowed to put anything on the refrigerators. He said that even work-related
things were not allowed to be posted there, other than the schedule. I asked Derek if he
had kept the union flyer that I had posted before this cleaning. He said that he did not. We
had to reprint the flyers we had made and we started putting them on the desk in the back
room. The flyers on the desk also disappeared quickly, though again I did not physically

Case 03-CA-285671

see anyone throw them away. We then started storing the flyers in some of the lockers that are in the back of the store. So far, no one has tried to remove the flyers from the lockers.

40) As of early January 2022, the Employer has hired about 15 new employees to work at the Sheridan & Bailey store. Even though the Sheridan & Bailey store is a busy one, we did not have a staffing problem when the union campaign started. We definitely did not need 15 new employees. Because we now have too many employees at our store, the baristas are having trouble getting enough hours each week. The shift supervisors have not had as many issues with their hours because most of the new hires are baristas. Several of the baristas that I have spoken to have told me that they are worried about losing their benefits because they are not working enough hours. At Starbucks, you are eligible for most benefits if you work at least 20 hours a week. Because of all the new hires, a lot of the baristas are having trouble reaching that number.

41) In late December, the week after Christmas, our store was short by five employees on the morning shift. Our new Store Manager was on vacation, so the shift supervisors at our store reached out to other people in Buffalo for help. Two employees from the store on Camp Road in Hamburg ("the Camp Road store") volunteered to come to our store to help. One of them was Will Westlake, but I do not remember who the other person was. I do know that both of them are union supporters. From what I understand, they drove up from the Camp Road store and, when they got to our store, were told to go back to their store by Greta Case, our new District Manager. They were sent away even though we really needed the help at our store that day. I was not present when this happened; I heard about it from Danny Rojas, who was working that day.

Initials:   **R.C.**

Case 03-CA-285671

42) On January 1, 2022, I attempted to pick up a shift at the store on Niagara Falls Boulevard in Amherst ("the NFB store"). This store is very close to the Sheridan & Bailey store and we often trade supplies and products with each other when one of our stores is running short. On that day, I was working at my store. At around 11:00 a.m., I dropped off some product at the NFB store that they needed. When I got to the NFB store, one of the employees working there told me that they were short by five employees that day. I also saw in the Buffalo-wide shift pickup group chat, Buff Bucks, that someone at that store had asked for help that day. The Store Manager for the NFB store was on COVID leave, so I sent a text message to Case, the District Manager, while I was at the NFB store. Case was actually at the Sheridan & Bailey store that day. I told her that I was available to help at the NFB store that day. Case called me after I sent her this text message. She thanked me for offering to help but said she was heading over to the NFB store herself and that she would take care of it. I also know that Kharie, an employee from the store at Delaware Avenue and Chippewa Street in Buffalo ("DelChip"), also offered to come help out that day. A third employee also offered to come to the NFB store to help, but I do not remember which employee this was. All three of us were turned down. Although I do not recall the name of the third employee, I know that he, me and Kharie are all open and obvious union supporters. I believe this is why Case refused to let any of us work at the NFB store that day.

43) Case has been the District Manager for my store since about mid-December. My understanding is that the Employer split Buffalo from two districts into three districts and that Case was put in charge of one of the new districts at that time.

44) Also in mid-December, we were assigned a new Store Manager named Alex Roux. Roux was a Store Manager in Pennsylvania before he came to Buffalo. At first, I was under the

Case 03-CA-285671

impression that he was another support manager, but Roux has told me and other employees that he is staying indefinitely.

45) At some point in December, the Employer replaced the computers and registers in the store with newer models. I do not remember the exact date this occurred.

46) The last meetings that the Employer announced for employees at my store was supposed to be held on January 5, 2022. There was a snowstorm before those meetings and COVID rates were very high at the time. Because of these concerns, as well as not wanting to hear the antiunion message that we knew was coming during these meetings, everyone at my store collectively decided not to go to this meeting. Some of us had individual conversations with each other about it and those of us who are in a union advocate group chat agreed that none of us should come into the store for these meetings. The Employer had closed the store to hold these meetings.

47) The Employer's actions throughout this union campaign feels like psychological warfare. It is not just me who feels this way. I have talked to many other employees, both at my store and across Buffalo, who are exhausted by the pressure that Starbucks is constantly putting on us throughout this union campaign. Brian Murray, who works at another store and is a union supporter, had to take a leave of absence because of the toll that the Employer's actions are taking on him. I know of another employee at my store, Katie Froom, who went on a leave of absence before the union campaign started. She has not come back yet because she does not want to work in the environment the Employer has created at my store in response to the union campaign. We also talked about this with the Employer in one of the meetings that I attended, but they have not changed their conduct even though we have asked them to tone down the pressure.

48) I have nothing further to add at this time.

Initials:   **R.C.**

Case 03-CA-285671

**I understand that this affidavit is a confidential law enforcement record and should not be shown to any person other than my attorney or other person representing me in this proceeding.**

**I have read this Confidential Witness Affidavit consisting of 20 pages, including this page. I fully understand the Affidavit and I state under penalty of perjury that it is true and correct.**

**Date:  04/04/2022**                    **Signature:**                    **/s/ Rachel Cohen**

                                                                              **RACHEL COHEN**

**This affidavit was taken by:**

THOMAS
MILLER

Digitally signed by
THOMAS MILLER
Date: 2022.04.04 16:50:02
-04'00'

**THOMAS A. MILLER**
**Board Agent**
**National Labor Relations Board**

Initials:    **R.C.**

Starbucks Corporation
Case 03-CA-285671

# Confidential Witness Affidavit

**I, <u>VIANCA ZANED COLON</u>, under the penalty of perjury, state as follows:**

**I have been given assurances by an agent of the National Labor Relations Board (NLRB) that this Confidential Witness Affidavit will be considered a confidential law enforcement record by the NLRB and will not be disclosed unless it becomes necessary to produce this Confidential Witness Affidavit in connection with a formal proceeding.**

I reside at ███████████████████████████

My telephone number (including area code) is (█████████

My email address is ████████████████

I am employed by Starbucks Corporation ("the Employer" or "Starbucks")

located on the University of Buffalo's campus ("the UB Commons store")

1) I have been employed by the Employer since September 2019. I was originally hired to work at the Employer's store located at Delaware Avenue and Chippewa Street in downtown Buffalo ("the Delaware & Chippewa store"). I have worked at the UB Commons since May 2021. I have been a barista for the entire time I have worked for Starbucks. My current work availability is from Monday – Friday, from 3:00 p.m. – 7:30 p.m. I usually work about 15 – 20 hours per week. I was on a leave of absence from mid-November 2021 until early January 2022. Prior to my leave of absence, I was working about 20-25 hours per week.

2) The UB Commons store is located on the North Campus of the University of Buffalo. It is a café store, meaning it does not have a drive thru. The UB Commons store is located

**Privacy Act Statement**
The NLRB is asking you for the information on this form on the authority of the National Labor Relations Act (NLRA), 29 U.S.C. § 151 et seq. The principal use of the information is to assist the NLRB in processing representation and/or unfair labor practice cases and related proceedings or litigation. The routine uses for the information are fully set forth in the Federal Register, 71 Fed. Reg. 74942-43 (Dec. 13, 2006). Additional information about these uses is available at the NLRB website, www.nlrb.gov. Providing this information to the NLRB is voluntary. However, if you do not provide the information, the NLRB may refuse to continue processing an unfair labor practice or representation case, or may issue you a subpoena and seek enforcement of the subpoena in federal court.

**Exhibit 3(g)**                                    - 1 -                        Initials <u>V.Z.C.</u>

Case 03-CA-285671

in a rotunda with other shops and businesses, across from the school's student union. The Store Manager of my store is Tina Zunner. She has been my store manager since I first transferred to the UB Commons store.

3) All dates in this affidavit are in 2021 unless otherwise stated.

4) I first became aware of the organizing campaign by Starbucks Workers United ("the Union") sometime in early-to-mid- August. I do not remember the exact date that I learned about it, but I knew about it before it became public.

5) I was on a leave of absence from Starbucks from mid-August until mid-September.

6) Because not very many people at my store have expressed an interest in the Union, we have not had as many visits or disruptions to our work life as some of the other stores in the Buffalo area. However, from the time that I returned from my leave of absence in mid-September until I left on another leave of absence in mid-November, we did have several visits from Starbucks corporate personnel. I estimate that we were visited by about five or six of these corporate officials, in addition to the ones who held the meetings I attended about the Union that I will discuss further below in this affidavit. One of these visitors was Rossann Williams, who is the Executive Vice President of North America. I knew who she was when I first saw her and I also knew that she was in the area visiting stores from what people had told me at other stores. She came to my store one afternoon after the union drive started, although I do not remember the exact date. She is very hands-on and has a habit of patting people's shoulders when she is talking to them, I've noticed. I only had one brief conversation with her. She introduced herself, asked me my name, and then complimented my hair. That was the end of the

Initials: _V.Z.C._

Case 03-CA-285671

conversation between us. I had never seen any kind of corporate official from outside the
Buffalo area come to a store I worked in before the union campaign started.

7) On September 30, about a week after I returned from my leave of absence, I attended a
"listening session" held by Starbucks. I had never heard of a listening session before
this.  From talking to other employees, my understanding is that these listening sessions
were  being held because Starbucks knew about the union campaign and wanted to talk
to us  about it.

8) My understanding is that the listening session that I attended on September 30 was the
second listening session held at my store. I did not attend the earlier listening session.

9) I was scheduled to close the store the afternoon of the September 30 meeting. The store
closed early for this meeting, so I was one of the employees responsible for closing the
store and making sure that it was set up for us to have this meeting. The meeting was
supposed to start at 6:00 p.m. but it got started a little late because some partners were
running late and we had to finish the store closing before the meeting could start. The
meeting was held by Greta Case, Adam Modzel, and Kate Fenton. They only introduced
themselves by using their first names; I looked them up on LinkedIn to find out their full
names. Greta said she was a 17-year partner and had been a District Manager in New
York for five years. She did not say where in New York she was a District Manager.
Adam said he was a 15-year partner and was currently the Regional Director of
Operations in Washington, D.C. Kate said she was an 18-year HR representative and a
five-year Partner Resources team member. Kate did not say where she was from. There
were seven employees at this meeting, including me. At that time, I believe there were
about 20-30 total employees at my store. The meeting started with a coffee tasting, which
is something that is typical for new hires and people trying to get to know each other.

- 3 -                    Initials: <u>V.Z.C.</u>

After the three corporate officials introduced themselves, the hourly employees, including me, all introduced ourselves to them. Greta and Adam talked about how Starbucks listens to the collective operational needs of partners. Greta then said that recording this meeting was not permitted. Adam then talked about some of the changes that had recently taken place, including installing new nitro systems and ovens at all our stores. He also mentioned that my store had just gotten a Mastrena espresso machine. Adam also talked about how Starbucks had just hired 26 new partners in Buffalo and that 41 more were in the process of hiring. Adam also said that they were addressing the inventory issues that stores had and were scheduling deep cleans and resets for the Buffalo stores. One of my coworkers said that while the new equipment was appreciated, they were upset with the way it was installed. They mentioned that there was no communication from Starbucks about it being delivered and that it had disrupted store operations on the day it was delivered. The same employee also talked about how facility maintenance contractors had installed the new nitro system during peak business hours and that this, too, was very disruptive. I did not speak up about this at the meeting but I was present when the nitro machine was installed; I agree that it was very disruptive to have the machine installed while we had a lot of customers to serve. Several other employees also talked about how upsetting it was to have contractors and Starbucks personnel to come into the store unannounced at random times and disrupt operations. People also complained about the stores being shut down to have these meetings and expecting partners to come into work outside of their availabilities to come to these meetings. Several partners at my store, including me, said that it was noticeable how forceful Starbucks was being and that it made us uncomfortable and on edge. Adam apologized for the inconvenience but

Initials: <u>V.Z.C.</u>

otherwise did not directly address our concerns about how forceful Starbucks was being.

Greta and Adam then talked about some of the benefits that Starbucks offered, including

health insurance, mental health assistance, and childcare assistance, before turning the

floor over to Kate. Kate said that she was going to give us facts based on her experience

with unions. She referenced ongoing legal discussions but did not give us a lot of detail

about what those discussions were about and who was having them. She gave us the

name of a person who she said was representing the Union for these legal discussions but

told us that we needed to do our own research. She talked about the average length of a

union contract and told us that Starbucks could not help employees in the contract if we

did not like what the contract said. She talked about union dues and gave us the dues

amounts for employees who work more than 25 hours a week. She also told us that our

dues would go toward political and organizing efforts. I remember her telling us that

employees who work at unionized stores were not allowed to work at other stores that

were not unionized. For the most part, the information that Kate gave us was vague and

presented in a tone that seemed very discouraging. I and other partners in the meeting

asked her to clarify some of the things she said about the Union. Each time we did that,

Kate just said she could not provide any more information to us and that we needed to do

our own research. Kate finished her part of the meeting by describing the legal processes

occurring at the time. She said that the vote for stores to become part of the Union was an

all-or-nothing vote. One of the other employees asked her who would be voting, but her

response was just to tell us that it was very important to vote. The meeting ended at

around 7:30 p.m. The store remained closed for the rest of the night after the meeting

ended. At that time, the store would have normally closed at 9:00 p.m.

Initials: <u>V.Z.C.</u>

Case 03-CA-285671

10) I was one of the more outspoken employees during this meeting in terms of asking questions and requesting clarification on the things that the corporate officials were saying. As I was getting ready to leave the store after the meeting was over, Adam came up to me and thanked me for my questions. He also said that he was hoping to gain my trust. I said thanks but did not otherwise respond to his comments.

11) I found out about the September 30 meeting either through a text message or through a message in the GroupMe group chat for the UB Commons store. Although I do not remember the exact wording of the message I got, it left me with the impression that the meeting was mandatory. I believe it said something about needing to go to a different meeting if we missed the scheduled meeting.

12) Several of the employees that work at the UB Commons store are students at the University of Buffalo. Because they are students, their schedules are harder to rearrange outside their availabilities due to classes and other activities. A lot of the non-student employees also have other engagements in their personal lives and having to come back for a meeting outside of our availabilities is often difficult.

13) Before this September 30 meeting, I had never attended a meeting like this in my time with Starbucks. During the meeting, one of the corporate officials claimed that they have meetings like these all the time. I do not remember which of the three officials said this during the meeting. One of the employees who attended the same meeting as I did said that she remembered attending another listening session. She did not say how long ago they had been to a listening session or the circumstances of the listening session.

14) The only reasons I can think of that a Starbucks store would close early are some sort of staffing or equipment issues, or an emergency of some other kind. In my time with

Initials: __V.Z.C.__

Starbucks, I am not aware of a store closing early to hold a meeting like what happened on September 30.

15) Just after I returned from my leave of absence in mid-September, the Employer installed new equipment in my store. As I mentioned above, the Employer installed a new nitro machine. It was nice to get the new machine but, like my coworker discussed in the September 30 meeting, the installation took place during our busiest hours and it was very disruptive to business that day. Facilities workers also came into the store around the same time and replaced all our refrigerators and ovens. Again, they usually installed these things during our busy time, so we were forced to work around them while they did this work. I know from talking to employees at other stores that new equipment was being installed at their stores around the same time.

16) In mid-October, a manager named Kevin was assigned to help our manager, Tina, run the store from mid-October until mid-December. Kevin told me that he was there to help out. He never gave me his last name and just told me that he was from California Kevin was helpful and nice when he was at my store. He worked on the floor with us along with helping Tina with her job. Kevin never tried to talk to me about the Union and, to my knowledge, he did not try to talk to anyone else at my store about the Union either.

17) Between the corporate visitors who came to our store and the meetings we were being required to have, it felt like Starbucks was trying to keep an eye on all of us and trying to make sure that we did not have a union. It is hard to describe, but the entire atmosphere at my store changed to be much more negative since Starbucks started having visitors come to our store, having meetings, and making changes to the store itself. Almost everyone I talked to at my store, whether or not that person supported the Union, told me that they feel the same.

Initials: <u>V.Z.C.</u>

Case 03-CA-285671

18) The September 30 meeting was not the only meeting I attended about the Union. I have the most detail about this meeting because I took notes during that meeting. I did not take notes during the other meetings I attended. The next meeting I attended was not held at the store. It was held at a Courtyard by Marriot near the UB Commons store. We were told during this  meeting that Starbucks had listened to us about the store meetings being disruptive and  that was why they moved the meetings offsite. They still closed the store on the day of  the meeting. They also broke us up into different groups. I received a letter about the time and location of the meeting. The letters were very formally written and it looked like  some kind of legal summons. A couple of us, including me, asked Tina about the letters  we received and if everything was ok. Tina could not answer our questions because she did not have a lot of information about these meetings herself. Tina was not at the meeting that I attended at the Courtyard by Marriot. The letters given to us were dated a week before the meetings began, but most employees found out about their scheduled meetings shortly they happened.

19) I do not remember the exact date of the Hyatt meeting. There were about 15-20 employees at the meeting I attended. The Starbucks officials who were holding this meeting were Greta, Deanna, and another woman whose name I do not recall. I had not seen this woman before this meeting. I do not know Deanna's full name or title. My meeting was scheduled from 8:00 p.m. – 9:00 p.m. When I arrived, I went through a COVID check-in at a table outside the conference room before coming in. We were all sitting in a circle. This meeting was also called a listening session but most of this meeting was the Employer telling us that we needed to vote "no" if our store petitioned for an election. Deanna and the woman I did not recognize presented a slideshow of

Initials: _V.Z.C._____

"facts" about the Union trying to discredit it and the union efforts. We were told several times that we needed to vote "no." They did ask us if we had questions at the end of this meeting, but it was such an aggressive presentation that none of us had any questions. I did not speak during this meeting. Greta did not say much during this meeting. The meeting lasted about 45 minutes to the best of my recollection. We all left very quickly after the meeting ended. When we were walking out to the parking lot, me and a few of my coworkers were talking about how crazy the meeting had been. We talked about how the UB Commons store is not a pro-union store and that nobody really wanted a union at our store. We were all disgusted about how terrible Starbucks was acting throughout this whole process.

20) Because the Employer closed the UB Commons store the day of the hotel meeting, partners who were already scheduled to work needed to come to the meeting if we wanted to get paid. I was in that situation. I was scheduled for a shift that afternoon and I could not afford to miss the shift. This was the only reason that I went to the meeting. I would not have gone if I had not needed to get paid for the shift.

21) In my time working for Starbucks, I had never been to an offsite meeting, meaning a meeting held outside a store. No one else that I talked to could remember attending a meeting that was not held at a Starbucks store. After that meeting, everyone walked to the parking lot together.

22) Shortly after this second meeting that I went to, I took the medical leave that I discussed above. I have not been to a store meeting since that time. I do not know if there were more meetings held while I was out on medical leave.

Initials: <u>V.Z.C.</u>

Case 03-CA-285671

23) It seems like Starbucks has hired a lot more employees in the months since the union campaign started. In early January 2022, I heard one of my coworkers, a shift supervisor, talking about how hours had been cut at my store. I believe this may have had something to do with the new employees who have been hired to work at my store. As of the date I am giving this affidavit, I have not noticed a change in my hours. I just returned from my medical leave recently, however, and I am being eased back into a normal schedule.

24) Staffing has been a problem at my store since I started working there. The UB Commons store is usually a very busy location because of its location on a college campus. We lost a few employees after the fall semester, but it seems like the Employer has hired more employees than we needed to cover the staffing issues that we have had. It is hard for me to tell exactly when this happened or exactly how many new partners have been hired because I was out for several months on medical leave.

25) At some point during my medical leave, in December, the Employer reset our storage room. The storage room is in the same building as the UB Commons store but it is not physically connected to the store itself. The storage room is on the second floor of the building and the store is on the first floor. The storage room was reset to be more functional and give us more space for storage. The storage room is where we keep our extra merchandise as well as backup equipment and refrigerators.

26) The back of my store has a small backroom that we use to do dishes. Around the same time that the storage room was reconfigured, the Employer changed the flooring to make it harder for us to slip. They also installed a machine that kills bugs. Most Starbucks stores, including the UB Commons store, has issues with fruit flies. The machine that was installed is supposed to help with that issue.

Case 03-CA-285671

27) The Employer also gave our store new iPads and installed a new mobile order sign for the UB Commons store. These changes also took place when I was on medical leave in late 2021.

28) At some point when I was on medical leave in late 2021, the Employer changed the hours of my store. I don't know if that was because of the pandemic cases rising, but it could have been. The hours of my store are now 7:00 a.m. – 7:00 p.m. each day. Before the change, the store was open until 9:00 p.m. each night. Because I am only available from 3:00 p.m. on each day, a change in the closing time of the store cuts down the hours that I can be scheduled. I know of several employees who are in a similar situation and could lose hours because the store is not open as long each day.

29) I have not experienced any issues involving Starbucks' dress code. I am aware that there have been issues at other stores in Buffalo where management has been much stricter about the dress code, but that has not happened at my store. I have also been very careful to make sure I am following the dress code because of what has been happening at other stores. Before I went on my medical leave in mid-November, Tina had me sign the dress code policy. It was not a formal discussion. From what I remember, Tina just said that I should sign the dress code policy that had been left on a table for us to review. That was the only thing said to me about the dress code since the union campaign started.

30) A similar thing happened with the time and attendance policy. Around the same time that Tina asked me to sign the dress code policy, she asked me to sign the time and attendance policy. I have not had any issues with time and attendance since the union campaign started but I know that Starbucks has been coming down hard on people at other stores about it. I try to be very careful not to violate the policy because I am scared about this

Initials: _V.Z.C._

Case 03-CA-285671

happening to me as well. I am not aware of other employees at my store having issues with this policy.

31) I am aware that the kiosk in the Walden Galleria ("the kiosk") was closed by Starbucks. I did not work at that location, but I know from word of mouth that the kiosk was very overworked and short staffed before it shut down. My understanding is that the employees at the kiosk were about to file for an election when they were shut down. The employees at the kiosk were displaced to different stores in the Buffalo area. Most of my knowledge about what happened with the kiosk came from my friends at the Delaware & Chippewa store, where I worked before I transferred to the UB Commons store. The Delaware and Chippewa store was sent some of the employees who worked at the kiosk before it was closed down.

32) I also know that the store at Walden Avenue and Anderson Road ("the Walden & Anderson store") was closed down and turned into a training store. This store, like the kiosk, was either about to file for an election at their store or had already filed for an election when it was shut down. My understanding is that all the new hires were then trained at the Walden & Anderson store. Their training lasted only three days and then they were sent to a store to work. From what I have heard from other employees, these new hires were not prepared to work in a store that quickly. For comparison, I was trained at the Delaware & Chippewa store over the course of a week and a half during operating hours. Some of these new hires were not even given aprons, were not trained on how to make drinks or handle food correctly. I have never heard of Starbucks closing a store to turn it into a training store. The Walden & Anderson store has reopened to the public, although I do not recall when that happened.

Initials: <u>V.Z.C.</u>

Case 03-CA-285671

33) I have nothing further to add at this time.

**I understand that this affidavit is a confidential law enforcement record and should not be shown to any person other than my attorney or other person representing me in this proceeding.**

**I have read this Confidential Witness Affidavit consisting of 13 pages, including this page. I fully understand the Affidavit and I state under penalty of perjury that it is true and correct.**

Date:  3/24/2022                    Signature:  _Vianca Zaned Colon_

                                               **VIANCA ZANED COLON**

This affidavit was taken by:

**THOMAS MILLER**

Digitally signed by
THOMAS MILLER
Date: 2022.03.24
09:49:08 -04'00'

**THOMAS A. MILLER**
**Board Agent**
**National Labor Relations Board**

- 13 -                    Initials: V.Z.C.