UNITED STATES OF AMERICA

BEFORE THE NATIONAL LABOR RELATIONS BOARD

REGION 3

In the Matter of:

STARBUCKS CORPORATION,   Case No.   03-CA-291377

                        Employer.

**MURPHY/FLEISCHER MEETING**

The above-entitled matter was transcribed from an audio recording with an unspecified time and location on **Tuesday, February 22, 2022.**



```
 1                    P R O C E E D I N G S
 2         UNIDENTIFIED SPEAKER 1:  Hi Cassie, it's Michaela from
 3   Starbucks calling.  Just calling to update you and check in.
 4   If you could give me a call back.  My phone number is 509-570-
 5   4953.  Look forward to hearing from you, thank you.  Bye.
 6   (Phone ringing)
 7         UNIDENTIFIED SPEAKER 1:  This is Michaela.
 8         UNIDENTIFIED SPEAKER 2:  Hi Michaela, it's Cassie.
 9         UNIDENTIFIED SPEAKER 1:  Hi Cassie, how are you?
10         UNIDENTIFIED SPEAKER 2:  I'm okay, how are you?
11         UNIDENTIFIED SPEAKER 1:  I'm doing well.  I was calling to
12   check in on you.  I heard kind of, just, the most recent
13   updates, and I'm understanding that there is a belief that you
14   were separated from Starbucks; is that correct?
            [were written above crossed-out "are"]
15         UNIDENTIFIED SPEAKER 2:  Yes, as far as I know, that's
16   what happened.
17         UNIDENTIFIED SPEAKER 1:  Okay.  So I did want to call to
18   clarify.  You have not been separated from Starbucks.  So you
19   are still very much so very active in the Starbucks system as
20   of right now.
21         UNIDENTIFIED SPEAKER 2:  Until three weeks from now; is
22   that correct?
23         UNIDENTIFIED SPEAKER 1:  So that is not my understanding.
24   Would love, Cassie -- it's kind of why I wanted to talk to you,
25   was, one, to reiterate, you haven't been separated.  That was
```



1  not my understanding, I didn't even know that that's the
2  direction we have moved to quite yet. And so I wanted to just
3  get a better understanding from you of how that conversation
4  with Patty last landed. So I did connect with her regarding
5  your conversation on Saturday earlier today, where I know she's
6  been talking to you about availability. But did not understand
7  how we -- how we skipped a couple steps and moved straight to
8  an understanding of separation.
9      UNIDENTIFIED SPEAKER 2: Okay, so what I essentially was
10 told is that I am not on the schedule for the next two weeks --
11     UNIDENTIFIED SPEAKER 1: Um-hum.
12     UNIDENTIFIED SPEAKER 2: -- and that I would not be put on
13 the schedule following that, because there's no room in the
14 schedule for my current availability.
15     UNIDENTIFIED SPEAKER 1: Um-hum. So did you and Patty
16 have a conversation of taking some time to reflect on your
17 availability recommendation and request and have that
18 conversation of, is there a way for us to meet in the middle,
19 because -- I want to be really clear, Cassie, like, our
20 intention in having this conversation was -- was not to lead to
21 separation. It was truly to find some sort of agreement to
22 say, hey, I can open up my availability X amount to be
23 available to support the store and the needs of the business.
24 Because I think -- you and I both know that you are what I
25 would classify as a full-time partner, working a pretty set

1   schedule for five days a week, 30 plus hours.
2       And obviously, I think you know, that's a -- a huge hit
3   for the store to go from five days of availability to two, and
4   just didn't know if there was that conversation of flexibility
5   in your ability to -- to move forward with a different
6   availability?
7       UNIDENTIFIED SPEAKER 2: Well, I -- I unfortunately cannot
8   open [up] my availability past the two days, but I did offer to open
9   up my availability on Saturday to be available more hours. And
10  the last I heard was that Patty had to talk to you to see if
11  that was an option.
12      UNIDENTIFIED SPEAKER 1: Okay, so as of right now, Cassie,
13  again, I'll just reiterate, so we kind of have two options.
14  One of which is, hey, we can take some time, and we can move
15  forward with truly reassessing if there's anything beyond just
16  opening up Saturday, because where -- where we're at with the
17  Friday, Saturday availability is -- that is a similar
18  availability to almost 80 percent of the team, through the lens
19  of, other partners are available to work those days. And so
20  where we truly needed the support is during the timeframe that
21  you previously had offered.
22      So I understand that you did get a second job, but we want
23  to make it clear that -- that you do have a choice, this --
24  this is not a conversation of, hey, you're separated, or if.
25  It's -- it's a matter of, hey, we want to present to you an



1  opportunity to expand upon your availability so that you don't
2  have to choose to leave Starbucks. Does that make sense?
3      UNIDENTIFIED SPEAKER 2: Well, it does, but realistically,
4  what are my options besides opening up Sunday? Which if I open
5  up Sunday, I won't ever have a day off.
6      UNIDENTIFIED SPEAKER 1: Okay. So there -- what does --
7  what does the other job look like? I -- I'm not -- I'm unclear
8  on the other job and what that scheduling look -- appears to
9  be.
10     UNIDENTIFIED SPEAKER 2: The other job unfortunately is 8
11 a.m. to 5 p.m., Monday through Thursday, and then 8 a.m. to 1
12 p.m. on Fridays.
13     UNIDENTIFIED SPEAKER 1: Okay, wait, say that -- 8 a.m.
14 to 1 p.m. on Fridays is what you said?
15     UNIDENTIFIED SPEAKER 2: Yep, and then 8 a.m. to 5 p.m.
16 Monday through Thursday.
17     UNIDENTIFIED SPEAKER 1: Got it, okay. Well, sounds like
18 an excellent gig. From what I understand, it's what you've
19 been looking for; is that correct?
20     UNIDENTIFIED SPEAKER 2: It's I think a step in a -- a
21 different for me, but I don't know if it's the right direction
22 yet.
23     UNIDENTIFIED SPEAKER 1: Okay. So did you and Patty have
24 that conversation of potentially taking a leave of absence to
25 really get your feet wet in this other job and determine if

```
 1    it's the -- the correct career path for you and give you that
 2    space to make that decision to say, hey, things are working out
 3    great, I'm -- I'm going to choose to step away from Starbucks
 4    or hey, you know what, it's not all that I imagined, and I
 5    think I'm going to resign, and I'd love to make my priority
 6    again Starbucks.  Have you had that conversation?
 7         UNIDENTIFIED SPEAKER 2:  We -- she brought that up the
 8    first time we had a conversation, and I told her that it was my
 9    understanding of the policy that you couldn't take a leave of
10    absence for another job.
11         UNIDENTIFIED SPEAKER 1:  Hm, okay.  I can -- I can look
12    into it.  Again, it's just an option as I was looking to say,
13    hey, how do we protect your job status --
14         UNIDENTIFIED SPEAKER 2:  Um-hum.
15         UNIDENTIFIED SPEAKER 1:  -- to allow you to explore this.
16    If that is something that is allowed and can be accommodated,
17    would it be something that you want to consider at that point?
18         UNIDENTIFIED SPEAKER 2:  It would be something that I
19    would want to consider.
20         UNIDENTIFIED SPEAKER 1:  Okay.  So Cassie was -- I'm just
21    writing this down so I can make sure.  Yeah, and then I think
22    as long as we outlined it as, hey, it's a 30-day personal
23    leave.  Because what I've understood, thus far, Cassie, under a
24    personal LOA, is that it's for personal matters.  You get one
25    every several years for 30 days.  Of course it -- it doesn't
```



1  come with pay, as it's just protected -- it's intended to
2  protect your job for whatever duration of time. So I will
3  follow up to see if there's any technicalities there that do
4  not allow this situation to translate.
5       UNIDENTIFIED SPEAKER 2: Um-hum.
6       UNIDENTIFIED SPEAKER 1: But wanted to make sure, you
7  know, of course, that I circled back with you, and were
8  receiving the support that you needed to navigate the next
9  steps.
10      UNIDENTIFIED SPEAKER 2: Okay, thank you.
11      UNIDENTIFIED SPEAKER 1: Of course. Okay, so what I will
12 do is I will reach out with urgency to understand what our
13 options are from a leave perspective. And then I can circle
14 back with you. And then I would just ask that in the meantime,
15 Cassie, that, you know, you just take some time just to reflect
16 on if the LOA is an option, you know, is it time that -- that
17 you've had that reflection to say, I'm going to focus my
18 attention here and -- and step away from Starbucks in good
19 standing and be able to reapply in the future when there's
20 potential for more availability that can offer to support the
21 store?
22      UNIDENTIFIED SPEAKER 2: Yeah, I think the biggest thing
23 for me is just that it is -- that it ends up being my choice --
24      UNIDENTIFIED SPEAKER 1: Um-hum.
25      UNIDENTIFIED SPEAKER 2: -- and not something that ends up

1  being thrust upon me.

2  UNIDENTIFIED SPEAKER 1: Yeah, yeah. And I think that --
3  that's what's most important here, Cassie, is that I want you
4  to understand that you have a choice. However, I think you
5  also know that in the same conversation, that there is only so
6  much that we can do through the lens of multitudes of partners
7  reducing their availability. And so where we're going to get
8  to as a store, and where we're kind of already at is that we're
9  going to have to make some hiring decisions to bring more
10 people on to accommodate for partners that are reducing their
11 availability. Which, I think we both know in total then adds
12 more partners, and the partners that are already not getting
13 the hours that they want are going to continue to feel that
14 pressure as we add more partners.

15 UNIDENTIFIED SPEAKER 2: So my question is, the hours that
16 are not being covered by me not being there, why is that
17 someone else needs to be hired instead of those hours just
18 being dispersed to other partners that are currently employed
19 at the store?

20 UNIDENTIFIED SPEAKER 1: So we -- absolutely disperse any
21 and all available hours to partners that have the ability --
22 availability to do so. The situation that's -- that's happened
23 inside of your store, which is why we're -- we're having
24 conversations, is there's been an influx in the number of
25 partners that have created these requests to adjust their

1   availability.  And so with an increased number of partners
2   limiting their availability, there are fewer and fewer shifts
3   available to be filled for those hours that we need to operate.
4   So although we might have availability, in a handful of
5   partners, it's a matter of, does that availability match how we
6   would write the schedule to appropriately ensure, you know,
7   during peak, there's six or seven partners, if that's what
8   we're earning from a labor perspective.
9       UNIDENTIFIED SPEAKER 2:  Um-hum.
10      UNIDENTIFIED SPEAKER 1:  Does that make sense?
11      UNIDENTIFIED SPEAKER 2:  Yeah.
12      UNIDENTIFIED SPEAKER 1:  So I mean, that's truly what it
13  comes down to.  And I apologize if there was any sort of
14  miscommunication.  But that was not anybody's intention was
15  for -- for you to feel like that conversation was your last
16  conversation at Starbucks.  That was -- that was not the
17  intention whatsoever.
18      UNIDENTIFIED SPEAKER 2:  I just -- I -- I just want to
19  say, for the sake of saying it that I understand what you're
20  saying, but I really did leave that conversation feeling like
21  that was the conversation that we had, was termination.
22      UNIDENTIFIED SPEAKER 1:  Okay.  And -- and I fully
23  understand, and I think that's why I really wanted to
24  understand if there was -- if there was any language that was
25  used in that conversation that -- that made it seem that way.

1   Because what I understand, and I -- I haven't heard you say it
2   yet, is that Patty specifically said, hey, if you don't open up
3   your availability on this date, you will be terminated.  If
4   that was what was relayed, I can absolutely circle back.  But I
5   would love to just understand from your perspective what got us
6   to that conclusion of, hey, I'm going to be separated.
7        UNIDENTIFIED SPEAKER 2:  Well, she did not give me a date.
8   That was something that I was going to circle back to myself.
9        UNIDENTIFIED SPEAKER 1:  Okay.
10       UNIDENTIFIED SPEAKER 2:  But she did heavily imply that,
11  you know, I wouldn't be put on the schedule for the next three
12  weeks, and that she was essentially buying me time by not
13  terming me out of the system that day.  But I don't know what
14  she was buying me time for.
15       UNIDENTIFIED SPEAKER 1:  Okay, so I will circle back.  I
16  will circle back with Patty and -- and just better clarify,
17  like, where we're at with the situation.  Is there -- I
18  obviously promised that I would circle back with you as soon as
19  I get any answer on the LOA.  Apart from the LOA, is there an
20  appropriate timeline for you that makes sense to circle back on
21  what decision you would like to make?
22       UNIDENTIFIED SPEAKER 2:  I would say -- I'm sorry, you're
23  asking me if -- like, what timeline to have the information, or
24  to make a decision?
25       UNIDENTIFIED SPEAKER 1:  So when you're talking



1   information, what are you talking to specifically?
2        UNIDENTIFIED SPEAKER 2:  The LOA.
3        UNIDENTIFIED SPEAKER 1:  Sorry, I just want to make sure
4   we're really clear.  Oh yeah, so the LOA.  So I will follow up
5   on the LOA.  I -- I don't see why I can't get an answer today.
6        UNIDENTIFIED SPEAKER 2:  Okay.
7        UNIDENTIFIED SPEAKER 1:  I'll make some phone calls, and I
8   should be able to call you back, hopefully, honestly, within
9   the next hour, to say, hey, this is what I've learned.  And so
10  I think what I was saying as second theory to that was, hey, if
11  the LOA works out, great.  Sounds like we've got a path
12  forward.  If the LOA doesn't work out, that's where I was
13  coming with second -- the second question, which was, when
14  would you like to circle back on kind of where your thoughts
15  are in making a decision on opening up ~~available~~ availability or
16  continuing -- or choosing to step away from Starbucks?
17       UNIDENTIFIED SPEAKER 2:  Honestly, I -- to be completely
18  honest, I'm still trying to process everything.
19       UNIDENTIFIED SPEAKER 1:  Okay.
20       UNIDENTIFIED SPEAKER 2:  It's been kind of hard for me to
21  make a decision on anything.
22       UNIDENTIFIED SPEAKER 1:  Yeah.
23       UNIDENTIFIED SPEAKER 2:  So I don't know if I can really
24  give you like a -- a good timeline, right now.  But I can get
25  back to you on that as soon as I figure it out.



1    UNIDENTIFIED SPEAKER 1:  Okay.  And that sounds perfect,
2    and if there's enough space between this conversation and when
3    I -- I hear the details of LOA, you can absolutely share with
4    me then.  And of course, if that's not enough time, why don't
5    you just give me a call, or even shoot me a text message to
6    say, hey, I've -- I've been thinking about things.  And if I
7    could have until this date, and that would work out great.  And
8    then we can set up time to follow up at that point.
9    UNIDENTIFIED SPEAKER 2:  Okay.
10   UNIDENTIFIED SPEAKER 1:  Okay?
11   UNIDENTIFIED SPEAKER 2:  Yeah, that sounds good.
12   UNIDENTIFIED SPEAKER 1:  Excellent.  What -- what other
13   questions do you have?  Or is there anything else that I can
14   support you with now that I have you on the phone?
15   UNIDENTIFIED SPEAKER 2:  I think I have asked all of the
16   questions that I currently have.
17   UNIDENTIFIED SPEAKER 1:  Okay.
18   UNIDENTIFIED SPEAKER 2:  Again, will definitely follow up
19   with you if I think of anything else.
20   UNIDENTIFIED SPEAKER 1:  Okay, perfect.  And you -- this
21   is my direct number, as you know, so please, Cassie, don't
22   hesitate to reach out with any questions.  Anything that comes
23   up as a concern, I'm absolutely here to support you through
24   this, okay?
25   UNIDENTIFIED SPEAKER 2:  Okay, thank you.


GC Exh 147b

```
 1         UNIDENTIFIED SPEAKER 1:  All righty, thank you, Cassie,
 2   and hopefully I should be talking to you here very soon.
 3         UNIDENTIFIED SPEAKER 2:  Okay, sounds good.
 4         UNIDENTIFIED SPEAKER 1:  Okay, thank you.
 5         UNIDENTIFIED SPEAKER 2:  Bye.
 6         UNIDENTIFIED SPEAKER 1:  Bye.
 7   (Whereupon, the hearing in the above-entitled matter was
 8   closed)
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

```
 1                   C E R T I F I C A T I O N
 2    This is to certify that the attached meeting before the
 3    National Labor Relations Board (NLRB), Region 3, Case Number
 4    03-CA-291377, in the matter of Starbucks Corporation, that this
 5    is the original, complete, true and accurate transcript that
 6    has been compared to the recording provided by the Region.
 7
 8
 9
10                              _Wesley Gillebaard_____
                                WESLEY GILLEBAARD
11                              Transcriber
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

