## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF NEW YORK

---

**LINDA M. LESLIE, Regional Director
of the Third Region of the National
Labor Relations BOARD, for and on
behalf of the NATIONAL LABOR
RELATIONS BOARD**

        **Petitioner,**              **No. 1:22-cv-00478-JLS**

**vs.**

**STARBUCKS CORPORATION,**

        **Respondent.**

---

## <u>WORKERS UNITED'S AMICUS CURIAE BRIEF IN SUPPORT OF 10j RELIEF</u>

Ian Hayes, Esq.
Michael Dolce, Esq.
HAYES DOLCE
Attorneys for Workers United
135 Delaware Ave., Ste. 502
Buffalo, NY 14202
716-608-3427
ihayes@hayesdolce.com
mdolce@hayesdolce.com

## TABLE OF CONTENTS

TABLE OF AUTHORITIES………………………………………………………ii

PRELIMINARY STATEMENT………………………………………………..1

FACTUAL BACKGROUND………………………………………………………1

ARGUMENT…………………………………………………………...……………2

I.     THE REGIONAL DIRECTOR HAS EASILY SATISFIED HER BURDEN TO SECURE § 10j RELIEF……………………………………………………..2

II.    STARBUCKS' EXTENSIVE AND EXTREME VIOLATIONS REQUIRE INJUNCTIVE RELIEF……………………………………………………4

    1.  Starbucks' Hallmark Violations Necessitate Injunctive Relief…………..4

        (a) Store Closures………………………………………………….4

        (b) National Wage Increase and Other Grants of Benefits………8

        (c) Terminations and Other Retaliatory Discipline………………9

    2.  The Extensiveness of Starbucks' Anti-Union Conduct Requires Injunctive Relief………………………………………………………10

        (a) The Board Considers the Extent of Violations in Issuing Relief…………………………………………………………10

        (b) The Extent and Severity of Starbucks' Unlawful Conduct Is Unprecedented in the Second Circuit…………………...…....11

III.   THE REGIONAL DIRECTOR IS ENTITLED TO ALL RELIEF PRAYED FOR………………………………………………………………………14

    1.  Relief Must Prevent Irreparable Harm to Ongoing Organizing Efforts and Restore the Status Quo Existent *Before* Starbucks' Unlawful Conduct…………………………………………………………...15

    2.  Nationwide Relief Is Necessary to Prevent Irreparable Harm to Starbucks Organizing Activity and to Protect the Public Interest in the Free Selection of Collective Bargaining Representatives under the NLRA………………………………………………………………16

    3.  The Court Must Reinstate the Discharged Discriminatees, Order Starbucks to Bargain at Camp Road, and Order Starbucks to Reopen the Galleria Kiosk…………………………………………………………24

# TABLE OF AUTHORITIES

**Cases**                                                        **Page(s)**

*Ahearn v. Jackson Hospital, Inc.*,
351 F. 3d 226 (6th Cir. 2003) ............................................................. 9

*Aldworth Co.*,
338 NLRB 137 (2002) ........................................................................ 4

*Alle-Kiski Medical Center*,
339 NLRB 361 (2003) ........................................................................ 4

*Arlook v. S. Lichtenberg & Co., Inc.*,
952 F.2d 367 (11th Cir. 1992) ............................................................ 9

*BS&B Safety Systems, LLC*,
370 NLRB No. 90 (Feb. 19, 2021) ..................................................... 6

*CSC Holdings, LLC*,
365 NLRB No. 68, slip op. at 4-5 (2017) ............................................ 7

*Danielson v. Ladies' Garment Workers (ILGWU*,
494 F.2d 1230 (2d Cir. 1974) ............................................................. 3

*DHL Express Inc.*,
355 NLRB (2010) ............................................................................... 4

*Evergreen America Corp.*,
348 NLRB 178 (2006) ........................................................................ 11

*Gerig's Dump Trucking, Inc.*,
320 NLRB 1017 (1996) ...................................................................... 8

*Healthcare Emps. Union, Loc. 399 v. NLRB*,
463 F.3d 909 (9th Cir. 2006) ............................................................. 6

*Hoffman v. Inn Credible Caterers, Ltd.*,
247 F.3d 360 (2d Cir. 2001) ...................................................... 3, 4, 15

*Int'l Baking Co.*,
342 NLRB 136 (2004) ........................................................................ 7

*Kaynard v. Palby Lingerie, Inc.*,
625 F.2d 1047 (2d Cir. 1980) ..................................................... 3, 5, 12

*Kreisberg v. HealthBridge Mgmt., LLC*,
732 F.3d 131 (2d Cir. 2013) .................................................. 3, 13, 14, 15

*Lake Mary Health & Rehab.*,
345 NLRB 544 (2005) ........................................................................ 4

*Ley ex rel. NLRB v. Wingate of Dutchess, Inc.*,
182 F. Supp. 3d 93 (S.D.N.Y. 2016) .................................................. 8

*Methodist Hospital of Kentucky*,
318 NLRB 1107 (1995) ...................................................................... 4

*Murphy ex rel. NLRB v. Hogan Transps., Inc.*,
581 F. App'x 36 (2d Cir. 2014) ..................................................... 8, 14

*Murphy v. Hogan Transports, Inc.*,
607 Fed. Appx. 70 (2d Cir. 2015) ...................................................... 14

*Newburg Eggs, Inc.*,
  357 NLRB 2191 (2011).....................................................................................4

*NLRB v. Jamaica Towing, Inc.*,
  632 F.2d 208 (2d Cir. 1980)........................................................................4, 5, 9

*NLRB v. Savoy Laundry, Inc.*,
  327 F.2d 370 (2d Cir. 1964).............................................................................6

*Novelis Corp. v. NLRB*,
  885 F.3d 100 (2d Cir. 2018).............................................................................8

*Overstreet ex rel. NLRB v. El Paso Disposal, L.P.*,
  625 F.3d 844 (5th Cir. 2010) ......................................................................10, 24

*Parts Depot*,
  332 NLRB 670 (2000)......................................................................................4

*Pye ex rel. NLRB v. Excel Case Ready*,
  238 F.3d 69 (1st Cir. 2001).............................................................................10

*RBE Electronics of South Dakota*,
  320 NLRB 80 (1995)........................................................................................4

*Schwab Foods*,
  223 NLRB 394 (1976).......................................................................................4

*Seeler v. Trading Port, Inc.*,
  517 F.2d 33 (2d Cir. 1975) .......................................................................Passim

*Serv-U-Stores*,
  225 NLRB 37 (1976)......................................................................................4, 5

*Silverman v. J.R.L. Food Corp.*,
  196 F.3d 334 (2d Cir. 1999).........................................................................3, 13

*Small v. Avanti Health Sys. LLC*,
  661 F. 3d 1180 (9th Cir. 2011)........................................................................25

*Traction Wholesale*,
  328 NLRB 1058 (1999)....................................................................................4

*Wallace International de Puerto Rico, Inc.*,
  328 N.L.R.B. 29 (1999)....................................................................................8

*Winter v. Natural Resources Defense Council*,
  555 U.S. 7 (2008) ............................................................................................3

*Wright Line*,
  251 NLRB 1083 (1980).....................................................................................5

## PRELIMINARY STATEMENT

Workers United respectfully submits this amicus curiae brief in support of the NLRB's petition for temporary injunctive relief under Section 10(j) of the National Labor Relations Act. Though not a party to this proceeding, Workers United has a strong interest in the outcome of the Court's decision.  As the testimony at the hearing established, Respondent's extensive and extreme violations of the National Labor Relations Act (hereinafter "Act" or "NLRA") cast a chill over organizing efforts in the Buffalo-area and in stores throughout the country.  The most extreme violations—store closures, terminations, announcing new benefits and withholding the same—continue to have lingering effects both on organizing and support for the Union.  Workers United must now undertake the task of negotiating collective bargaining agreements with the Respondent Starbucks, a task made substantially more difficult if its strongest supporters are not immediately reinstated pending resolution of the NLRB's administrative complaint.  Workers United submits that granting the NLRB's request for interim injunctive relief will restore the status quo ante and effectuate the policies of the NLRA.

## FACTUAL BACKGROUND

Workers United adopts the recitation of facts and evidence as set forth in the NLRB's Omnibus Brief.  In the immediate wake of the Union's organizing campaign in Buffalo, New York in August 2021, Respondent embarked on one of the most ruthless anti-union rampages in United States history.  Viewing union activity as an existential threat, the Company stopped at nothing to silence its employees' voices and quell organizing activity within its Buffalo-area stores. Starbucks transferred over 100 managers to the area, disrupted store operations, forced employees into captive audience meetings in which the Company solicited grievances, promised new benefits,

and threatened the loss of others, separated employees from their coworkers, closed stores, and eventually terminated union leaders. Many of these violations occurred during the "critical period" between the filing of the first three petitions on August 30, 2021 and the first three elections on December 9, 2021. The violations did not stop after the first three elections, as early union victories only encouraged the Company to escalate its anti-union behavior.

In the face of this, the employees documented everything and fought back against the Company's heinous anti-union campaign. The Union filed dozens of charges, submitted mounds of evidence, and after Region 3 of the NLRB found merit to over 300 separate violations of the Act, an administrative complaint issued. The Region then brought the instant petition for injunctive relief, seeking to ensure Starbucks cannot use its might to undermine the dictates of federal law.

## ARGUMENT

The Regional Director has easily satisfied her burden to demonstrate reasonable cause of the alleged violations, and that injunctive relief is just and proper to effectuate the policies of the Act. The Company's extensive and extreme violations require injunctive relief—Starbucks committed nearly every violation delineated by Board law, including every "hallmark" violation of the Act. Moreover, the Company escalated its anti-union campaign to the national level by announcing a national wage increase on the eve of the first Buffalo-area elections, and by chastising Buffalo-area union supporters via its intranet platforms throughout the campaign. Not only is interim relief necessary here, but the Court must grant nationwide relief to uphold the free selection of collective bargaining representatives for Starbucks workers across the country.

## I.    THE REGIONAL DIRECTOR HAS EASILY SATISFIED HER BURDEN TO SECURE § 10j RELIEF.

The Second Circuit retains a two-part test to determine whether 10j relief is necessary: (1) whether there is reasonable cause to believe the unfair labor practices have occurred; and (2) whether 10j relief is just and proper. *Hoffman v. Inn Credible Caterers, Ltd.*, 247 F.3d 360, 364–65 (2d Cir. 2001); *Kreisberg v. HealthBridge Mgmt., LLC*, 732 F.3d 131, 141 (2d Cir. 2013). While other Circuits employ a general four-part injunction analysis as explicated by the Supreme Court in *Winter v. Natural Resources Defense Council*,[1] the Second Circuit does not,[2] rather incorporating equitable principles into its "just and proper" analysis. *See Inn Credible Caterers*, 247 F.3d at 368 ("In this Circuit, injunctive relief under § 10(j) is just and proper when it is necessary to prevent irreparable harm or to preserve the status quo. While this standard preserves traditional equitable principles governing injunctive relief, we are mindful to apply them in the context of federal labor laws.").

To establish reasonable cause, the evidence required is less than that for enforcement of a Board order after a full hearing on the merits. *Inn Credible Caterers*, 247 F.3d at 365 ("The district court does not need to make a final determination whether the conduct in question constitutes an unfair labor practice; reasonable cause to support such a conclusion is sufficient."). For "disputed issues of fact … the Regional Director should be given the benefit of the doubt," *Seeler v. Trading Port, Inc.*, 517 F.2d 33, 36-37 (2d Cir. 1975), and the Regional Director's factual findings should be sustained if "within the range of rationality." *Danielson v. Ladies' Garment Workers (ILGWU) (Hazantown, Inc.)*, 494 F.2d 1230, 1245 (2d Cir. 1974); *see also Silverman v. J.R.L. Food Corp.*,

---

[1] 555 U.S. 7 (2008) (clarifying the general injunction standard: (1) likelihood of success on the merits; (2) whether there is an adequate remedy at law; (3) whether irreparable harm will occur; and (4) whether the injunction is in the public interest).
[2] *HealthBridge*, 732 F.3d at 141 ("*Winter* did not alter the law in this Circuit with respect to the standard that applies for § 10(j) injunctions.").

196 F.3d 334, 337 (2d Cir. 1999).  On questions of law, "the district court should be hospitable to the views of the General Counsel, however novel." *Hazantown, Inc.*, 494 F.2d at 1245; *see also Kaynard v. Palby Lingerie, Inc.*, 625 F.2d 1047, 1051 (2d Cir. 1980).  Such a deferential standard is easily met here with hours of recordings, hundreds of exhibits, and dozens of witnesses all supporting the Regional Director's well-established legal theories under the NLRA.

      Once reasonable cause is shown, the court may grant such relief as it deems just and proper. "[I]njunctive relief under § 10(j) is just and proper when it is necessary to prevent irreparable harm or to preserve the status quo." *Inn Credible Caterers*, 247 F.3d at 368.  Courts must consider "irreparable harm to the union's position in the plant, to the adjudicatory machinery of the NLRB, and to the policy of the Act in favor of the free selection of collective bargaining representatives" because "section 10(j) should be applied in the public interest and not in vindication of purely private rights." *Trading Port*, 517 F.2d at 39-40.  The extensiveness and extreme nature of Respondent's violations require the Court to grant all relief prayed for to uphold the public interest in the free selection of collective bargaining representatives.

## II.    STARBUCKS' EXTENSIVE AND EXTREME VIOLATIONS REQUIRE INJUNCTIVE RELIEF.

      Respondent's violations of the NLRA are both extensive and extreme.  Starbucks committed nearly every violation ever contemplated by the NLRB,[3] including the most extreme "hallmark" violations of the Act.  *See NLRB v. Jamaica Towing, Inc.*, 632 F.2d 208, 212-213 (2d

---

[3] *See* Petitioner's Omnibus Brief for more in-depth discussion, but such violations include (1) Surveillance and the Impression of Surveillance; *see Methodist Hospital of Kentucky*, 318 NLRB 1107 (1995); *Alle-Kiski Medical Center*, 339 NLRB 361 (2003); (2) Solicitation of Grievances; *see Traction Wholesale*, 328 NLRB 1058 (1999); (3) Threat of Loss of Benefits; *see DHL Express Inc.*, 355 NLRB 1339 (2010); (4) Grant of Benefits; *see Newburg Eggs, Inc.*, 357 NLRB 2191 (2011); (5) Withdrawal of Benefits; *see Lake Mary Health & Rehab.*, 345 NLRB 544 (2005); (6) Store Closures; *see Serv-U-Stores*, 225 NLRB 37 (1976); (7) Terminations and Retaliatory Disciplines; *see Parts Depot*, 332 NLRB 670 (2000); (8) Discriminatory Policy Enforcement; *see Aldworth Co.*, 338 NLRB 137 (2002); *Schwab Foods*, 223 NLRB 394 (1976); (9) Failure to Bargain; *see RBE Electronics of South Dakota*, 320 NLRB 80 (1995).

Cir. 1980) (noting "hallmark" violations are "highly coercive" acts including "the closing of a plant or threats of plant closure or loss of employment, the grant of benefits to employees, or the reassignment, demotion or discharge of union adherents in violation of §8(a)(3) of the Act."). Such outrageous conduct demands prompt and comprehensive relief.

### 1.    Starbucks' "Hallmark" Violations Necessitate Injunctive Relief.

#### (a)    Store Closures

The closing of Buffalo-area stores in the immediate aftermath of the Union campaign had an inherent chilling effect on organizing activity across the region, necessitating §10(j) injunctive relief. *See Serv-U-Stores*, 225 NLRB 37, 38 (1976) (ordering the employer to bargain where it "clos[ed] its furniture store … because of the union activity of the employees therein and in order to chill unionism at its other stores."); *Jamaica Towing, Inc.*, 632 F.2d at 212-213 (holding threat of plant closing was highly coercive, warranting injunctive relief); *Trading Port*, 517 F.2d at 36 (affirming §10(j) injunction where, *inter alia*, company threatened to close its warehouse and to refuse to take back strikers when the strike ended); *Palby Lingerie*, 625 F.2d at 1050 (granting §10(j) injunction where, *inter alia*, employees were threatened with the closing of the plants and other reprisals if they supported the union).

Here, the Regional Director has easily satisfied her *Wright Line* burden for both the Walden & Anderson and Galleria Kiosk store closures.[4]  There is no dispute that there was union activity in both stores and that Starbucks was aware of such activity because employees from both stores signed the August 23, 2021 letter to former Starbucks CEO Kevin Johnson. *See* GC Ex. 3.  Half of the employees at the Galleria Kiosk signed the "Dear Kevin" letter and Walden & Anderson employee Colin Cochran vocally confronted Starbucks officials Rossann Williams, Allyson Peck,

---

[4] *Wright Line*, 251 NLRB 1083 (1980) ("[1] the employee was engaged in protected activity; [2] the employer was aware of the activity; and [3] the activity was a substantial or motivating reason for the employer's action.")

and Deanna Pusatier at one of the first "listening sessions" three days before his store was closed. Tr. 1786-87; Tr. 1929.  Both stores were closed mere days after the organizing campaign went public, and nothing had changed in store operations in the contemporaneous weeks besides the Company's aggressive response to the union campaign.  *See Healthcare Emps. Union, Loc. 399 v. NLRB*, 463 F.3d 909, 919 (9th Cir. 2006) ("Motive is a question of fact, and the NLRB may rely on both direct and circumstantial evidence to establish an employer's motive, considering such factors as the employer's knowledge of the employee's union activities, the employer's hostility toward the union, and the timing of the employer's action.").

Starbucks' shifting justifications for closing Walden & Anderson and the Galleria Kiosk demonstrates its unlawful motive.  *NLRB v. Savoy Laundry, Inc.*, 327 F.2d 370, 371 (2d Cir. 1964) ("we recognize that the crucial factor is not whether the business reasons cited by Savoy were good or bad, but whether they were honestly invoked and were, in fact, the cause of the change."); *BS&B Safety Systems, LLC*, 370 NLRB No. 90 (Feb. 19, 2021) ("we rely only on the timing of the [unlawful conduct] and evidence of pretext as found by the judge, including the Respondent's shifting explanations for [the unlawful conduct]").  At Walden & Anderson, the store manager texted employees on September 6, 2021 that the store was closing for retraining of the store's employees and to exterminate a bee infestation.[5]  Tr. 1931.  Starbucks VP Allyson Peck then sent a communication to all employees in the Buffalo-area on September 9, 2021, outlining the Company's plans to turn one store in the region into a regional training facility.  *See* GC Ex. 25. The letter did not say which store.  *See id.*  Then, in the following weeks the Company converted Walden & Anderson into a regional training facility, the first of its kind in the area.  *See* Tr. 1931-

---

[5] Interestingly enough, these were the exact grievances that Colin Cochran discussed at the September 2, 2021 listening session with Company officials Rossann Williams, Allyson Peck, and Deanna Pusatier.  *See* Tr. 1929.  Soliciting such grievances and then remedying them in response to union activity is a blatant violation of the Act.

1934.  The timing and shifting justifications look even worse when one considers employees at Walden & Anderson filed an RC Petition on September 9, 2021.  *See* GC Ex. 12.

Starbucks maintains that the Galleria Kiosk was closed as part of a nationwide plan to close stores in shopping malls due to changes in consumer behavior.  This contradicts the record, in which Company officials first told employees that the store was closing temporarily, then later changed their mind and said it would be permanently shut down.  *See* Tr. 1791-1794.  Moreover, the Company's justifications provide no cover under the law, as it did not produce any evidence that the *timing* of the permanent closure was planned before the union campaign.  *See Int'l Baking Co.*, 342 NLRB 136 (2004).

Moreover, Starbucks' conversion of the Walden & Anderson store into a regional training facility is itself unlawful under the Act, and the Company's purpose for the conversion makes it even more so. As the Regional Director points out, the closure was both an unlawful grant of benefit in response to employee grievances, as well as a threat to employees in other stores that union activity could result in their own stores shutting down.  Likewise, the Company's unabashedly stated purpose of the conversion—to facilitate a massive hiring spree—is also unlawful because it was intended to dilute support for the union in area stores.  *See CSC Holdings, LLC*, 365 NLRB No. 68, slip op. at 4-5 (2017).  As Regional Director Mallori Coulomb testified, Starbucks hired roughly 150 employees in the Buffalo-area in the immediate months after the union campaign went public, the vast majority of whom were trained at the regional training facility.  However, the Company presented no evidence of such hiring efforts in other metro areas afflicted with the same alleged short-staffing issues as the Buffalo market uncovered at the July 2021 regional meeting in Saratoga Springs, including other mid-size metros like Rochester, Syracuse, Albany, and others.  Such drastic measures under thinly veiled pretext demonstrates

immediate relief is necessary to combat Starbucks' anti-union campaign and to uphold the free selection of collective bargaining representatives under the NLRA.

### (b)       National Wage Increase and Other Grants of Benefits

The Board has long recognized wage increases as "likely to have a pervasive and lasting deleterious effect on the employees' exercise of their Section 7 rights." *Wallace International de Puerto Rico, Inc.*, 328 N.L.R.B. 29 (1999); *Novelis Corp. v. NLRB,* 885 F.3d 100, 106 (2d Cir. 2018) (noting employer violates Section 8(a)(1) when it confers benefits on employees in an effort to interfere with union organization);  *see also Murphy ex rel. NLRB v. Hogan Transps., Inc.,* 581 F. App'x 36, 37-38 (2d Cir. 2014) (summary order) (Second Circuit affirmed cease and desist order, but questioned why an interim bargaining order had *not* been issued in the presence of "several highly coercive unfair labor practices," including wage increase); *Ley ex rel. NLRB v. Wingate of Dutchess, Inc.*, 182 F. Supp. 3d 93, 103 (S.D.N.Y. 2016) (holding injunctive relief appropriate where, *inter alia*, company issued a 2% wage increase days after the union had authorization cards from majority of eligible employees); *Gerig's Dump Trucking, Inc.*, 320 NLRB 1017, 1018 (1996) *enfd.* 137 F.3d 936 (7th Cir. 1998) ("Unlawfully granted benefits have a particularly long lasting effect on employees and are difficult to remedy by traditional means not only because of their significance to the employees, but also because the Board's traditional remedies do not require a respondent to withdraw the benefits from the employees. Further, the benefits unlawfully granted will serve as a reminder to the employees that the Respondent, not the Union, is the source of such benefits and that they may continue as long as the employees do not support the Union.")

Starbucks announced a national wage increase on October 27, 2021, the day before the Regional Director ordered single-store elections at the Elmwood Avenue, Genesee Street, and

Camp Road stores, and less than two weeks before ballots were to be mailed to employees.  *See* GC Ex. 59; GC Ex. 8.  The wage increase announced new minimum wage floors throughout the country and also granted seniority-based pay increases—one of the primary employee grievances throughout the early union campaign.  *See* GC Ex. 59;  *See* Tr. 309.  In employee Michelle Eisen's eleven years as a barista with Starbucks in both New York and Hawaii, she had never received a seniority-based pay increase, nor received any pay increase outside of Starbucks' scheduled annual raise for all employees.  *See* Tr. 308-309.  The Company's justification for the increase was to bolster investments in employees after the Covid-19 pandemic, *see* GC Ex. 59, but again it offered no justification for the *timing* of the increase.  The pretextual nature of the Company's justification is heightened by the simple fact that October 2021 was *20 months* after Covid-19 dramatically impacted workplaces throughout the United States.

### (c)      Terminations and Other Retaliatory Discipline

Discharging union supporters is "likely to have a lasting inhibitive effect on a substantial percentage of the workforce."  *Jamaica Towing, Inc.*, 632 F.2d at 213 ("the reassignment, demotion, or discharge of union adherents will carry a message which cannot be lost on employees in the voting group. While there is some slight chance that a single 8(a)(3) violation will not be perceived as employer retribution, repeated violation will rarely if ever be misinterpreted.").  Such discharges have a particularly adverse impact on collective bargaining when they precede negotiations for a first contract because new units without a signed agreement are "highly susceptible to management misconduct".  *See Ahearn v. Jackson Hospital, Inc.*, 351 F. 3d 226, 239 (6th Cir. 2003) (quoting *Arlook v. S. Lichtenberg & Co., Inc.*, 952 F.2d 367, 373 (11th Cir. 1992) and affirming 10(j) injunction requiring the employer to reinstate three discharged union supporters).

Strong support in the bargaining unit for collective bargaining is a necessary condition for a Union to successfully negotiate a contract.  The process of collective bargaining can take time before the parties reach agreement; maintaining a unified position and support for the Union's bargaining committee is crucial.  That is why the "discharge of active and open union supporters . . . risks a serious adverse impact on employee interest in unionization and can create irreparable harm to the collective bargaining process."  *See Pye ex rel. NLRB v. Excel Case Ready*, 238 F.3d 69, 74-75 (1st Cir. 2001); *see also*, *Overstreet ex rel. NLRB v. El Paso Disposal, L.P.*, 625 F.3d 844, 856 (5th Cir. 2010) ("In exceptional cases . . . the district court may employ an injunction ordering reinstatement, so as to prevent the destruction of employee interest in collective bargaining, irreparable injury to the union's bargaining power, and the undermining of the effectiveness of any resolution through the Board's process.").

There is no dispute that all of the discharged discriminatees were known union supporters actively involved in organizing their stores.  Cassie Fleischer and Kellen Higgins were both members of the Elmwood Avenue bargaining committee, and both were forced out of the Company within two months of the first negotiating session.  *See* Tr. 2033; Tr. 645-46.  Moreover, they were both forced out pursuant to a new rule imposed by the Company post-certification without bargaining with the Union.  Such blatant disregard for the NLRA deserves immediate and comprehensive relief.

### 2. The Extensiveness of Starbucks' Anti-Union Conduct Requires Injunctive Relief.

#### (a) The Board Considers the Extent of Violations in Issuing Relief.

Not only did Starbucks commit the worst violations contemplated by the NLRB, it committed a staggering number of violations.  In *Evergreen America Corp.*, 348 NLRB 178, 180

(2006), the Board relied upon the coercive impact of the employer's non-hallmark violations, which were "both numerous and serious" in issuing a bargaining order:

> [A]t the outset of the organizational effort the Respondent reacted swiftly with a torrent of 8(a)(1) violations committed over a 3-month period. They included 13 separate instances of unlawful interrogations by 11 different supervisors; 15 instances of implied promises to remedy solicited grievances; 8 instances of actual promises to do so; 2 instances in which employees were instructed not to attend union meetings, not to read union literature and to throw the literature away; and 1 instance of creating the impression that the union activities of employees were under surveillance.

*Id.*  The instant case dwarfs the conduct contemplated in *Evergreen*, as Starbucks does not even refute it transferred upwards of 100 executives and managers to the Buffalo-area in the immediate wake of the union campaign; conducted dozens of captive audience meetings in which high-ranking officials solicited grievances, promised new benefits, threatened existing benefits, and interrogated employees; increased managerial presence in stores so that all working time was actively surveilled; cut the hours of union supporters; imposed new work rules under which employees were disciplined; prevented pro-union employees from attending events; amongst other violations.  In all, the Regional Director found merit to over 300 separate violations of the law. Such extensive unlawful conduct demonstrates Starbucks' pathological anti-union animus, requiring injunctive relief.

> **(b)     The Extent and Severity of Starbucks' Unlawful Conduct is Unprecedented in the Second Circuit.**

The Second Circuit has never seen the extent and severity of Starbucks' unlawful conduct. There is no question that injunctive relief is necessary here under Second Circuit precedent.  The only question is how such behavior can be properly remedied under the law.

In *Trading Port*, the Second Circuit upheld the district court's 10(j) injunction, yet extended the relief to include a bargaining order.  517 F.2d 33 (2d Cir. 1975).  There, the employer:

> 1) threatened employees with the loss of jobs and other reprisals if they selected the union or went on strike; 2) promised benefits to employees if they abandoned the union; 3) threatened to close its warehouse and to refuse to take back strikers when the strike ended; 4) coercively interrogated employees about how they would vote in the coming election; and 5) discriminated against union supporters in its rehiring practices after the strike and before the election.

*Id.* at 36.  While all of the issues in *Trading Port* are present here, Starbucks' violations go above and beyond any contemplated there.  In addition to the mere threat of store closure, Starbucks shut down two stores in the immediate wake of the organizing campaign.  In addition to discriminating against union supporters in policy enforcement, Starbucks created new post-certification policies under which to eliminate bargaining committee members without negotiating with the Union. Moreover, the extent of the violations in *Trading Port* does not come close to those alleged here.

In *Palby Lingerie*, another case in which the Second Circuit upheld an interim bargaining order:

> [T]he employer was alleged to have violated ss 8(a)(1) and 8(a)(3) by laying off two employees, Sharon Hunter and Maria Ferrante, in February, 1979 and refusing to recall them until late April, 1979; discharging a third employee, Rosetta Lyons, and refusing to reinstate her; and assigning its employees at the Elmont factory to "less agreeable job tasks" and subjecting them to "closer supervision and increased criticism," all because of their union activity. Finally, the employer's agents were alleged to have violated s 8(a)(1) by interrogating employees in both plants concerning their union involvement; giving employees at the Elmont factory the impression that their union activities were under surveillance; and threatening employees with the closing of the plants and other reprisals if they supported [the union].

625 F.2d 1047, 1050 (2d Cir. 1980).  Just as in *Trading Port*, all of the same conduct is present here, yet Starbucks' anti-union conduct goes much further.  Here, not only was there "closer supervision," surveillance was omnipresent in all Buffalo-area stores—made possible by the simple fact Starbucks used its vast resources to transfer scores of executives and managers from around the country to the Buffalo-area.  *See* Tr. 423, 1855-6, 1684.  Not only were two employees not rehired after a layoff, long-time employees that led organizing campaigns were targeted and

terminated for heinous violations, like Angel Krempa for wearing a nose-piercing that her manager had said was acceptable at the time of hire, and Brian Nuzzo for showing up to work *early* after several of his coworkers had called out for the shift.  *See* Tr. 1020-29; Tr. 2546-65.  Again, the extent of the violations pale in comparison to those here.

In *J.R.L. Food Group*, the Second Circuit overturned the district court and granted interim reinstatement to a discriminate after the district court denied reinstatement based on its own credibility determination.  196 F.3d 334, 337 (2d Cir. 1999) ("the district court received no new evidence as to the events leading to the firing of Cortes, having granted the Board's motion to have the 'reasonable cause' issue decided on the basis of the transcript and exhibits presented in the unfair labor practice hearing before the ALJ.").  There, the Second Circuit granted 10(j) relief where:

> JRL is charged with violating the Act by, *inter alia*, directing its employees not to join the Union, interrogating employees about their Union activities, and threatening employees with discharge or a reduction in their work hours if they joined the Union. One such employee was Cortes, who had been a cashier at the store until JRL terminated her employment[.]

*Id.* at 336.  Here, the unlawful activity is unequivocally more extensive and extreme.

In *HealthBridge*, the Second Circuit upheld the district court's grant of 10(j) relief where an employer imposed unilateral changes without negotiating with the union, and then sought to further implement its unilateral changes by declaring impasse in negotiations over a new CBA. 732 F.3d 131 (2d Cir. 2013).  While *HealthBridge* is not a "nip in the bud" case, it is instructive on the propriety of injunctive relief over Starbucks' unilateral changes post-certification.  There, "changes included altering certain employees' hours, overtime pay, vacation policies, and benefits, subcontracting out certain employees' work and then rehiring them at reduced wages and benefits, and conducting layoffs without notice."  *Id.* at 134.  Here, Starbucks unilaterally imposed its new

13

minimum availability policy—which the Company used to eliminate two Elmwood bargaining committee members—without notifying or bargaining with the union. Such a unilateral change requires 10(j) relief because "[w]ithout a restoration of the status quo, any future bargaining would occur in the shadow of work conditions unilaterally determined and imposed by [the employer]." *Id.* at 143.

In *Hogan Transports*, the Second Circuit overturned the district court's denial of an interim bargaining order where the employer "(1) discharged an employee because of his support for the union; (2) threatened employees with job loss if they selected the union as their bargaining representative; and (3) promised and granted a wage increase in order to dissuade employees from supporting the union." 581 F. App'x 36, 37 (2d Cir. 2014). The district court erred in comprehending the status quo ante under Section 10(j) of the NLRA. *Id.* On remand, the district court ordered the employer to bargain with the union, which the Second Circuit affirmed. *See Murphy v. Hogan Transports, Inc.*, 607 Fed. Appx. 70 (2d Cir. 2015). *Hogan Transports* presents many of the same "hallmark" violations at issue here, but not all of them, and the employer's conduct was not as extensive and all-encompassing as Starbucks' anti-union conduct.

## III.   THE REGIONAL DIRECTOR IS ENTITLED TO ALL RELIEF PRAYED FOR

Because Starbucks' unlawful conduct is unprecedented in the Second Circuit, the Regional Director's proposed remedies must be comprehensive and far-reaching to prevent irreparable harm and restore the status quo ante. The Regional Director's proposed relief—including a nationwide cease-and-desist order and national notice posting and other publication requirements (including via the Starbucks "Partner Hub" and other intranet networks), reinstatement of all discharged discriminatees, an interim bargaining order for the Camp Road store, reopening the Galleria Kiosk, rescinding unilaterally imposed policies, and precluding any more attempts to impose unilateral

changes in certified stores—is rationally tailored to effectuate the free selection of collective bargaining representatives under the NLRA.  Anything less will provide leeway for future abuse of our country's labor law.

### 1. Relief Must Prevent Irreparable Harm to Ongoing Organizing Efforts and Restore the Status Quo Existent *Before* Starbucks' Unlawful Conduct.

In the Second Circuit, "injunctive relief under § 10(j) is just and proper when it is necessary to prevent irreparable harm or to preserve the status quo." *Inn Credible Caterers*, 247 F.3d at 368. "The appropriate test for whether harm is irreparable in the context of § 10(j) cases is whether the employees' collective bargaining rights may be undermined by the asserted unfair labor practices and whether any further delay may impair or undermine such bargaining in the future." *Healthbridge*, 732 F.3d at 142.  "The appropriate status quo in need of preservation is that which was in existence before the unfair labor practice occurred."  *Id.* at 142-43.  In fashioning 10(j) relief, courts must consider "irreparable harm to the union's position in the plant, to the adjudicatory machinery of the NLRB, and to the policy of the Act in favor of the free selection of collective bargaining representatives" because "section 10(j) should be applied in the public interest and not in vindication of purely private rights."  *Trading Port*, 517 F.2d at 39-40.

The Court's remedy must therefore do several things.  First, the Court must structure relief to prevent irreparable harm to organizing activity at Starbucks stores throughout the country. Second, relief must protect the public interest in the free selection of collective bargaining representatives under the NLRA.  Third, Starbucks stores in the Buffalo-area as well as those around the country must be restored to their state as existed before Starbucks commenced its anti-union campaign in the Buffalo-area.

    **2.**    **Nationwide Relief Is Necessary to Prevent Irreparable Harm to Starbucks Organizing Activity and to Protect the Public Interest in the Free Selection of Collective Bargaining Representatives under the NLRA.**

The Court must order Respondent to cease and desist its unlawful activities nationwide and provide nationwide notice of its violations in order to ensure Starbucks employees are aware they may engage in protected concerted activity without fear of restraint, coercion, or retaliation.  On the eve of the first Buffalo elections, the Company issued a press release as well as a notification via its intranet platforms of a "billion-dollar" wage increase and new seniority-based raises.  After the early union campaign was successful—despite the Company's best efforts—national media outlets began covering the campaign.  In response, Starbucks sent out internal nationwide communications to all employees lying about the union and union supporters.  The nationwide effects of Starbucks' unlawful conduct can be felt throughout all corners of the country, as organizing efforts slowed when employees learned that Buffalo-area employees—even those who had sat at the negotiating table—were being eliminated from the company.  Such effects can only be remedied through national injunctive relief.

There is no dispute that Respondent announced to all of its employees that it was implementing a billion-dollar wage increase across the country, with a minimum wage increase as well as new seniority-based raises on October 27, 2021, less than two weeks before ballots went out in the first Buffalo elections.  *See* GC Ex. 59.  There is also no dispute that Starbucks announced its nationwide wage increase both via a press release and to every employee across the country via its "Partner Hub."  While national press like the *New York Times* and *Washington Post* had covered the filing of petitions and legal developments in Buffalo, the wage announcement was the first Company communication that made the union organizing campaign a national issue.

Likewise, after discriminatee Cassie Fleischer spoke with a reporter from the *Washington Post* and her name, photograph, and quotes were included in his article, Respondent proceeded to force her from the Company with a new "minimum availability" requirement. In response to the article, Respondent sent a communication to all of its employees nationwide that "a Buffalo partner claimed she was fired – she was not." GC Ex. 146. Cassie had recorded the conversation in which her manager said she would be "termed out" if she did not change her availability, and then gave that recording to the same reporter covering the story who continued to print articles on the story. *See* Tr. 2033. By February 2022, the Buffalo-area union campaign—and Starbucks' extreme response to it—was a national story.

Richard Bensinger was the lead organizer on the Starbucks Workers United campaign from its inception in August 2021. Bensinger noted that at first he thought the union had a chance to organize 17-18 stores in the Buffalo-area, but after Starbucks closed Walden & Anderson and the Galleria Kiosk, employees throughout the area expressed fear and a chilling effect amongst their coworkers:

> I think it was Delaware -- it's called Del Ken, the Delaware and Kenmore store, which we had high hopes for. We believe it signed right at a majority, in a matter of days. Once the store was closed at Walden Galleria, Walden Anderson, people were terrified. I -- I -- I went out to meet with the workers. I didn't go in, because there was a management -- I didn't go into the store to talk to them, but the president of Starbucks North America was there, sitting outside.
>
> But I remember I did talk to him afterwards. Josie and Devyn, are two of the employees. And they were saying that the whole store was afraid their store was closed -- was going to close, and that was a big issue, so -- so on the East Robinson store, I was -- I met in a park with Kayla Sterner, and that was -- her big concern was she felt there was movement in her store, but that the store closings, in particular, had scared people at her store.

Tr. 2515-16. Delaware Kenmore was permanently nipped in the bud, as employees there never filed for a union election. Starbucks' unlawful activity originally worked on East Robinson

employees, until organizers eventually convinced store leader Victoria Conklin to join the fight. Conklin and others eventually organized the East Robinson store during Summer 2022. To no one's surprise, Starbucks terminated Conklin soon after. *See* Administrative Complaint, NLRB Case No. 03-CA-296570.

As coverage of the campaign brought more interest, Bensinger spoke with workers in Starbucks stores throughout the country, and "as the campaign progressed, the nature [of those conversations] changed because the conduct of the Company got more fierce." Tr. 2510. Bensinger noted three primary concerns of employees looking to organize: (1) could they be terminated for organizing? (2) could their store close? (3) could the management "swarm" come to their stores? *See* Tr. 2510-11. All of these violations were at the center of Starbucks anti-union campaign in Buffalo. Bensinger noted that questions became more specific when Buffalo-area organizers started getting fired in February 2022, and that oftentimes employees would remember specific terminations based on the *conduct* underlying the Company's purported justification— "they would bring up what happened to people." *Id.* at 2512. This indicates Starbucks unlawful conduct in the Buffalo area was being closely followed by workers across the country.

Bensinger recalled how he and Angel Krempa were leading one such organizing conversation with workers in Virginia in which Krempa had to explain the circumstances around Cassie Fleischer's termination. Then Krempa herself was terminated and she had to discuss the circumstances around her termination with the same group:

> And in Virginia, there's a -- a weekly Zoom call for the partners in Virginia from various stores across the State that are organizing. And I was asked to come on and explain. I was asked by one of the organizers to come on and explain what had happened with Cassie, and Angel came on with me to that call. That was the very -- it was the very end of February, beginning of March, that time period.
>
> And so I had -- Angel did most of the explanation, trying to explain that we filed -- or were going to file charges – or filing charges. We didn't think it was not

incumbent past practice, and so that.  And then, again, when -- when Angel -- Angel, herself, subsequent to that, was fired, we were asked to bring Angel back on, to explain, which frightened people; because she had -- she had a appeared, to explain Cassie's termination.  Now, Angel, herself, was terminated.

And she came back on with me, and I think a couple of other Buffalo partners, to explain her termination, as well as other terminations that had occurred during -- right around the same time, mostly -- mostly in the month of March or early April.

Tr. 2512-13.  News of Buffalo-area terminations spread in real time as the Company intended to chill nascent organizing activity across the country.

Bensinger recounted more specific examples about how Starbucks egregious Buffalo-area spread throughout the country.  In Horn Lake, Mississippi, workers expressed fear over Fleischer's termination because they would "lose the right to switch to limited availability, as some of them had done in the past."  Tr. 2517.  The same issue existed in Austin, Texas, a university town where workers often changed their availability with the academic calendar.  *Id.*  One worker told Bensinger: "They didn't want to bring Buffalo to Austin."  *Id.*

One 10-year Starbucks employee from a store outside of Nashville, Tennessee contacted the Union and Bensinger spoke with him.  The man expressed support for the union but concern about what was going on in Buffalo.  "I explained there was a lot of heroism in Buffalo.  But he said people are going to remember -- that people weren't looking to be heroes, and they wanted to know what the chances were that they would fire people or close his store."  Tr. 2518.  The Union never heard back from him.

Bensinger recounted a conversation he had with workers from Fairfax County, Virginia right after there was media coverage of Danny Rojas's termination.  The Rojas termination concerned "his store to the point that he wasn't sure if he'd be able to build a majority at his store or not."  *Id.*

Bensinger recounted conversations in Florida in which workers expressed fear over the Buffalo and Rochester terminations:

> In Estero, Florida, there's a store that I was working with that did not win their election. That the big issue there was a fear of firings. And the firings in Buffalo and Rochester occurred right around their campaign time. And that, and they also were students there. They were afraid that of the limited availability issue, and that was frightening to them.
>
> In another Florida southern -- Florida in Hialeah, I attended a Zoom meeting there with -- it was a part meeting of -- they had -- it was a community labor meeting. They had people from DSA, an activist group, in Hialeah, and several members of the organizing committee in Hialeah. And they said their big worry was the store closings in Buffalo, and also the issue about Cassie, about limited availability. They -- someone had mentioned they had read about it. And -- and so I explained -- talked to them about that.

Tr. 2519.

Workers at a store in El Paso, Texas were terrified of the terminations going on in Buffalo during early 2022. Bensinger remembered: "That store was terrified of being fired." *Id.*

Bensinger was also on a Zoom call with workers from Virginia Beach, many of whom worked in stores that had already filed petitions, but there was one store that had not yet filed. Workers from the store that had not yet filed were "talking about how people were concerned about all the firings that were occurring in Buffalo, as well as the history of store closings." Tr. 2519-20.

Finally, Bensinger testified that he was asked to speak to workers in Vermont about what had happened in Buffalo in an attempt to address their concerns, in Spring 2022. *Id.* at 2520.

Daisy Pitkin also testified about the national impact of Starbucks' anti-union campaign on organizing activity around the country. Pitkin became the Deputy Organizing Director and National Field Director of the Starbucks Workers United campaign in May 2022. Tr. 2389. Prior to that, she had worked for Workers United in the Pittsburgh-area. Pitkin noted that she had

worked on about fifteen organizing campaigns before the Starbucks campaign, and that "this campaign, in my experience, is really unusual." Tr. 2391. Pitkin noted during "the beginning stages of the campaign, the rapidity [and] the momentum was something I had never seen. How quickly workers were ready and able to build organizing committees in their stores, and then build majority support for the Union in their stores was really unusual. I had never seen anything like it." Tr. 2391-92.

However, the campaign began to slow down in late Spring, early Summer 2022. "Workers who were really excited about organizing their stores having a more difficult time building an organizing committee, which is an important first step. And then it taking longer, and in some cases, not happening at all, to build majority support for the Union in their store and to file for Union elections." Tr. 2392-93. Pitkin noted "we were starting to hear a lot toward the end of March about firings that were happening, specifically in Buffalo." Tr. 2394-95. Pitkin heard it first from store-level employees when she was on the ground in Pittsburgh, and then later on when she convened meetings with organizers throughout the country "workers were telling them that they were afraid of losing their jobs if they organized. That they were afraid of losing certain benefits, like the right to transfer to other stores." Tr. 2395. Pitkin herself had conversations with three workers in California, Tr. 2408, three workers in Arizona, *Id.*, one worker in Illinois, *Id.*, two workers in Kansas, Tr. 2409, one worker in Oklahoma, *Id.*, and many in Pennsylvania, in which employees expressed fear of Starbucks retribution if they were to engage in organizing activity.

Pitkin recounted about how the Pittsburgh Starbucks Workers United organizing campaign had a lot of momentum into February 2022, but how that momentum abruptly changed:

> I remember, specifically, at the -- the end of March -- we started hearing about a whole slew of firings that had happened in Buffalo. I remember hearing about Cassie Fleischer's firing. And then, there were several others that happened. And

then Angel Krempa was fired. And it seemed as though there had been five or six firings that had happened all at once.

And at this point, you know, workers in Pittsburgh were in contact with workers in Buffalo.  They talked to each other all across the country and were hearing about this.  So certainly, by the end of March, workers were really concerned about what was happening.  That if they were going to organize in their stores, they could face disciplinary action, up to and including being fired from their jobs.

Tr. 2396.

As National Field Director of the Starbucks Workers United campaign in Summer 2022,

Pitkin was responsible with tracking the number of petitions filed across the country:

Well, as I mentioned, earlier on in the year, there was a lot of energy on the campaign, and organizing was happening quickly and kind of wildfire.  And I know that there were about 70 petitions that were filed in March.

And the number started going down a little bit into April. I think there were about 65 or 64 in April that were filed.  And then a more dramatic decrease through May and June and July.  So I think May, there were 45.  In June, there were 20 -- slightly more than 25.  26 or 27.  And then, in July, I – I'm not even sure we hit 15 filings that month.  I think it --the number might have been 14 in July.

Tr. 2397.  Pitkin also noted the steep drop in new workers contacting the Union, as the central

campaign email address received about 40-50 new contacts every week in the Spring, but by the

middle of Summer that number had decreased to "maybe 20."  Tr. 2398.

The election data also showed that Starbucks escalating violations during early 2022, such

as the Buffalo-area terminations that occurred from February through April, were having an impact

on store votes.  Pitkin noted that in "late spring and through the summer -- we started losing more

Union elections than we did early on.  And the vote spreads were tighter.  So even the elections

that we won, there were a lot more no votes than there were earlier on in the campaign."  Tr. 2399.

Pitkin also noticed a demonstrable change in tone in her communications with workers.  In

early 2022 there was "a lot of excitement" and workers were reaching out with interest in learning

how to organize, whereas by the Summer workers were apprehensive, "they were saying things

like, I would like to organize my store, but I'm not sure whether it would happen here.  There's a lot of fear."  Tr. 2398-99.

Emails to the Union's central email address confirm the effect of Starbucks unlawful conduct in Buffalo.  *See* GC Ex. 160.  In January 2022, a worker sent an email saying:

> *[A]fter researching events taking place in Buffalo*, Mesa, and what seems like all around the US, a group of partners in our cozy Northern Virginia store have decided to reach out and get more information about unionizing. […].  What we have found from our conversations is that *our partners like the idea of unions, but are scared of the potential corporate retaliation*.  As partners, we are committed to each other; making our working environment one in which we joke and enjoy our time as friends together.  We do not want our efforts to ruin this precious connection we have.  We would like more information about what other stores have faced as far as union-busting from corporate.  In addition, we would like more information on what we can do to minimize these corporate efforts if we were to experience them in our unionization process.

*Id.* (emphasis added)

Later in Spring 2022 workers cut right to the chase.  In April, a worker sent an email saying "I'm an almost 3 year partner who wants to unionize but I'm terrified of retaliation.  I want to know what I can do to get the ball rolling in my store while doing my best not to be targeted by union busting efforts."  *Id.*  A worker from Chicago emailed the campaign in May 2022, "I would love to unionize, and after putting out some feelers, it seems like a large portion, if not my whole store, would be on board with this.  I've never done anything like this and am usually a very quiet person that keeps to themselves so I am very nervous about everything.  I am afraid of being fired, or receiving backlash from upper management."  *Id.*  Another worker emailed the Union in May 2022, "I fear that I will lose my job if I make organization efforts because of the news with Starbucks and union busting."  *Id.*

The evidence is overwhelming that Starbucks' unlawful anti-union campaign in the Buffalo area had its intended effects in both Buffalo and the rest of the country.  Organizing momentum

slowed, elections started to turn, and workers expressed apprehension and fear as Starbucks' escalating anti-union campaign became national news.  In order to make sure Starbucks workers across the country know they have the right to freely select a collective bargaining representative of their own choosing, and in order to uphold the dictates of the NLRA in workplaces nationwide, the Court must grant nationwide relief.  Anything less is a license for large employers to trample over the law with impunity.

### 3.    The Court Must Reinstate the Discharged Discriminatees, Order Starbucks to Bargain at Camp Road, and Order Starbucks to Reopen the Galleria Kiosk.

The Court must grant the strongest forms of relief requested by the Regional Director in order to successfully deter Starbucks and future employers from undermining their employees' right to freely select their collective bargaining representatives.  To this point in the nationwide Starbucks organizing campaign, the Company has continued to escalate its behavior, and continues to egregiously perpetrate the most heinous "hallmark" violations of the Act.  An order from the Court is one step to deter such conduct and put an end to the Company's unlawful anti-union campaign.

The discharge of the seven employees for openly engaging in union organizing activity interfered with the Union's organizing efforts and, more importantly, will continue to undermine the Union's efforts to keep employees engaged and supportive of their bargaining representative and "prevent the destruction of employee interest in collective bargaining." *Overstreet ex rel. NLRB v. El Paso Disposal, L.P.*, 625 F.3d at 856. As the testimony established, these seven employees were active participants in organizing and bargaining activities at their respective locations and many became public faces of the campaign. Even after the Respondent terminated their employment for engaging in protected activity, these employees remained vocal and active in their support for the union. The Regional Director has produced sufficient evidence that the

absence of the seven discharged employees undermines support for the Union and that their reinstatement will clearly facilitate first-contract bargaining  both for their roles on the bargaining committee and their continued organizing activity in support of bargaining goals.  *See*, *Small v. Avanti Health Sys. LLC*, 661 F. 3d 1180, 1193 (9th Cir. 2011) (noting that employee support is necessary to bargain effectively.)

Likewise, Starbucks store closures in the Buffalo area require the Court to grant an interim bargaining order at Camp Road and to order Starbucks to reopen the Galleria Kiosk.  The Regional Director has established the necessity of an interim bargaining order under Second Circuit precedent, and the extent and severity of Starbucks anti-union campaign in Buffalo necessitate the Company reopen the Galleria Kiosk under Board law.

If  'what's past is prologue', the Respondent's hostile reaction to its employees voting to form a union in hundreds of Starbucks nationwide suggests that such hostility will carry over into collective bargaining for first contracts and thus, highlighting the urgency for reinstating the seven union leaders the Respondent unlawfully discharged, to order Starbucks to bargain with Camp Road employees after unlawfully interfering in their election, and to order Starbucks to reopen the Galleria Kiosk.  Workers United's experience in Buffalo, NY serves as notice that Respondent intends on aggressively resisting their employees' choice to organize[6] and their desire to

---

[6] The following is a non-exhaustive list of NLRB case numbers in which Starbucks is under investigation or prosecution for retaliatory terminations in response to union activity: 27-CA-296209; 27-CA-296692; 27-CA-29677227-CA-29780427-CA-298017;  14-CA-300506;  14-CA-293404;  14-CA-292529; 14-CA-295106;  14-CA-293122; 28-CA-301119; 02-CA-303077; 03-CA-302194; 03-CA-302464; 03-CA-302451; 03-CA-302560; 29-CA-299127; 29-CA-300213; 03-CA-296570; 03-CA-300849; 03-CA-300873; 03-CA-291377; 03-CA-291725; 03-CA-293362; 03-CA-293528; 03-CA-293546; 03-CA-294341; 08-CA-298846; 19-CA-302273; 19-CA-302274; 19-CA-295197; 16-CA-297588; 16-CA-296622; 19-CA-292276; 19-CA-297236; 19-CA-3000021; 19-CA-293492; 18-CA-295389; 18-CA-297420.

The NLRB is also actively investigating alleged unlawful store closures in response to union activity in Case No. 19-CA-299308, and has found merit to both 8(a)(3) and 8(a)(5) allegations of an unlawful store closure in Case No. 03-CA-296995 in nearby Ithaca, New York.

collectively bargain over the terms and conditions of their employment. Waiting years for the Board to order reinstatement and for a circuit court of appeals to enforce such order will be too late.

## **CONCLUSION**

For the aforementioned reasons, the Court should grant all relief requested in Regional Director Leslie's Petition pursuant to Section 10(j) of the National Labor Relations Act.


Dated: Buffalo, New York
      October 26, 2022                        Respectfully Submitted,

                                            Ian Hayes
                                            Hayes Dolce
                                            135 Delaware Avenue, Suite 502
                                            Buffalo, NY 14202
                                            (716) 608-3427
                                            ihayes@hayesdolce.com

## **CERTIFICATE OF SERVICE**

I certify that on October 26, 2022, the foregoing document has been electronically filed with the Clerk of the Court using the CM/ECF system. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

Ian Hayes
Hayes Dolce
135 Delaware Avenue, Suite 502
Buffalo, NY 14202
(716) 608-3427
ihayes@hayesdolce.com